THE FEDERAL LAND BANK OF WICHITA, *Appellee,* v. DELWIN BOTT, LOIS BOTT, HERMAN BOTT, and AMANDA BOTT, *Appellants,* and THE LINN STATE BANK, *Defendant,* and THE FEDERAL LAND BANK OF WICHITA, *Appellee,* v. HERMAN BOTT, AMANDA BOTT, DELWIN BOTT, and LOIS BOTT, *Appellants,* consolidated with

No. 59,737

THE FEDERAL LAND BANK OF WICHITA, *Appellee,* v. CLARENCE J. NELSON and ETHEL A. NELSON, *Appellants.*

(732 P.2d 710)

Opinion filed February 18, 1987.

*Philip D. Gordon,* of Colmery, McClure, Letourneau, Merriam & Stauffer, P.A., of Topeka, argued the cause and was on the briefs for appellants Bott.

*Dale M. Sprague,* of McPherson, argued the cause and *Fred W. Swoyer,* of Swoyer & Simms, of Belleville, was with him on the briefs for appellants Nelson.

*Calvin J. Karlin,* of Barber, Emerson, Six, Springer & Zinn, of Lawrence, and *Edward F. Wiegers,* of Galloway, Wiegers, Sprouse & Heeney, P.A., of Marysville, argued the cause and *Byron E. Springer,* of Barber, Emerson, Six, Springer & Zinn, of Lawrence, was with them on the brief for appellee.

*William J. Madden,* of Hays, argued the cause and was on the brief for *amicus curiae* Kansas Legal Services, Inc.

*Charles S. Arthur,* of Manhattan, was on the brief for *amicus curiae* The Kansas Farm Bureau.

*Ronald M. Gott,* of Gott, Young & Bogle, P.A., of Wichita, was on the brief for *amicus curiae* The Equitable Life Assurance Society of the United States.

*Wm. Scott Hesse,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Thomas Lietz,* assistant attorney general, were with him on the brief for intervenor State of Kansas.

The opinion of the court was delivered by

HERD, J.: This is a consolidated appeal from decisions of the district courts of Washington and Republic Counties, holding the Family Farm Rehabilitation Act, K.S.A. 1986 Supp. 2-3401 *et seq.,* unconstitutional.

The facts are not in dispute.

No. 59,734

On November 13, 1985, the appellee Federal Land Bank of Wichita filed a foreclosure action in Washington County against the appellants, Delwin, Lois, Herman, and Amanda Bott. On April 11, 1986, the district court granted judgment to the appellee for the amount of the notes plus interest and costs, and for foreclosure of the mortgage. No appeal was taken from the judgment.

On May 12, 1986, the Botts filed a motion for protection under the Family Farm Rehabilitation Act ("the Act"). On June 24, 1986, the district court issued a memorandum decision finding the Act unconstitutional and ordered execution to issue on the judgment. The Botts appeal from that ruling.

No. 59,737

On December 6, 1985, the Federal Land Bank of Wichita filed a foreclosure action in Republic County against Clarence and Ethel Nelson. On July 8, 1986, a journal entry of judgment was filed, granting judgment against the Nelsons plus interest and costs, and for foreclosure of the mortgage. No appeal was taken from this judgment.

On June 3, 1986, the Nelsons filed a motion for protection under the Family Farm Rehabilitation Act. On July 8, 1986, the district court held the Act unconstitutional and ordered execution to issue on the judgment. The Nelsons appeal from this ruling.

Prior to discussing the issues raised by the appellants, let us examine the provisions of the Family Farm Rehabilitation Act.

Recognizing the increasing rate of farm foreclosures, the declining value of land used for agricultural purposes, high interest rates, and low commodity prices, the 1986 Kansas Legislature enacted the Family Farm Rehabilitation Act. The stated purpose of the Act is "to assist in stabilizing the economic conditions of this state." K.S.A. 1986 Supp. 2-3401. The Act, which became effective May 8, 1986, authorizes the stay of enforcement of certain judgments relating to land and property used in farming operations and provides for redemption of that land and property in certain cases.

The Act is limited in scope to agricultural foreclosure or

repossession actions wherein the defendant is a "farmer" engaged in a "farming operation" and is "insolvent." A "farmer" is a person or family farm corporation which derives more than 80% of gross income from farming operations. K.S.A. 1986 Supp. 2-3402(c). "Insolvent" means a person has no equity in property other than exempt property under other provisions of Kansas law. K.S.A. 1986 Supp. 2-3402(e). The Act applies only to cases involving foreclosure of mortgages of agricultural land, the cancellation of a contract for the purchase of agricultural land, or the repossession of or collection against agricultural property commencing on or after October 1, 1985, which has been reduced to a final judgment without appeal. The Act automatically expires July 1, 1991. K.S.A. 1986 Supp. 2-3412.

Under the Act a farmer may apply at least 20 days prior to trial or hearing date for protection from foreclosure or repossession, or within 30 days of final judgment for actions pending on the effective date of the Act. At the hearing, the court must determine the current fair market value of the agricultural land and property as a whole as well as the fair market value of each parcel of land and each piece of property. The court must further determine whether the applicant is an "insolvent farmer" as defined in the Act and whether the provisions of the Act are applicable to the case. K.S.A. 1986 Supp. 2-3405.

If the court finds the Act applicable, the court must stay execution of judgment for 30 days. K.S.A. 1986 Supp. 2-3406(a). If within that 30 days, the farmer pays into court an amount equal to one year's interest on the fair market value of the agricultural land and/or one year's interest plus depreciation on the fair market value of the agricultural property (the court may alter such payment into semi-annual or quarterly-annual payments), the court must stay execution of the judgment for a period of one year after the first payment. K.S.A. 1986 Supp. 2-3406(a). (The interest rate required under the Act is equal to the average yield received on 52-week United States Treasury Bills at the most recent public offering prior to the time of payment by the debtor, plus 2%. K.S.A. 1986 Supp. 2-3406[c].) As part of its order of stay of execution, the court must specify "methods of providing adequate protection" of the land or property upon which execution has been stayed. K.S.A. 2-3406(a). "Adequate protection" is

defined as "those requirements which maintain the creditor n substantially the same position as the creditor was in at the time the court ordered a stay of execution of the judgment" and includes, but is not limited to, insurance, prevention of waste, and preservation and inspection of the land or property. K.S.A. 1986 Supp. 2-3402(f).

Upon the expiration of the first year's stay, up to two additional years' stays upon similar conditions may be entered by the court upon application by the farmer. K.S.A. 1986 Supp. 2-3406(b).

A key provision of the Act provides that during the stay period, a debtor waives his right to redeem as otherwise provided by law but still has the right to redeem as provided under the Act. K.S.A. 1986 Supp. 2-3406(d). The Act allows a farmer to redeem any part or all of the land or property subject to the stay by paying costs and taxes and the greater of the fair market value of the property determined by the court at the time of the initial hearing or at the time of the redemption. K.S.A. 1986 Supp. 2-3407.

If the farmer does not meet his payments or other obligations in maintaining the stay or redeeming the property under the Act, the creditor may proceed with execution of its judgment.

The Act states its provisions should not be construed to forgive or discharge any indebtedness of the judgment debtor or to affect any judgment lien on property of the defendant-owner or purchaser other than property subject to the mortgage or lien being foreclosed or the contract being cancelled. K.S.A. 1986 Supp. 2-3411.

The final clause of the Act is a severability clause providing that, if any part or parts of the Act are found to be unconstitutional, the remainder of the Act is presumed to be constitutional. K.S.A. 1986 Supp. 2-3413.

Before turning to the issue of the constitutionality of the Family Farm Rehabilitation Act, we first restate the basic principles applicable when the court considers the constitutionality of a statute. In *Barnes v. Kansas Dept. of Revenue*, 238 Kan. 820, 824, 714 P.2d 975 (1986), we held:

" 'This court adheres to the proposition that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if

possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done.' " (Quoting *State v. Huffman,* 228 Kan. 186, Syl. ¶ 1, 612 P.2d 630 [1980]).

See *Bingo Catering & Supplies, Inc. v. Duncan,* 237 Kan. 352, 354, 699 P.2d 512 (1985).

The primary issue presented for review is whether the Family Farm Rehabilitation Act unlawfully impairs contracts in violation of Article I, Section 10 (the contract clause) of the United States Constitution, which provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

The Federal Land Bank argues the Act impairs the obligation of its contracts made with the appellants by removing many important rights it holds as a mortgagee, including: (1) The right to retain the mortgage lien until the indebtedness secured thereby is fully paid; (2) the right to realize upon the security by a judicial sale; (3) the right to determine when such sale shall be held; and (4) the right to control the property after the normal redemption period. Further, the appellee contends the Act impairs its contracts with the appellants by reducing the interest rate from that provided in the note to the rate set by statute and by allowing the mortgagor to continue in possession for up to three years without paying real estate taxes or rent or accounting for profits.

Historically, the contract clause of the United States Constitution was adopted to prohibit the states from enacting laws which "impair the obligation of contracts." This prohibition has been construed as preventing the states from passing any statute which will alleviate the commitment of one party to a contract or which interferes with the enforcement of the contract. See Hale, *The Supreme Court and the Contract Clause,* 57 Harv. L. Rev. 512, 621, 852 (1944). The contract clause does not apply to the United States government, thus permitting federal bankruptcy laws.

The motive for adoption of the contract clause was to prohibit states from retroactively interfering with contracts between private parties. Specifically, the main thrust of the clause was intended to prevent the states from enacting debtor relief legislation. (The Family Farm Rehabilitation Act is a debtor relief law.) The delegates to the Constitutional Convention recognized

money lenders required assurance that credit arrangements would not be cancelled by state legislatures under pressure from troubled borrowers. The delegates also realized economic growth is dependent upon a stable environment for those who have capital to invest or loan. 2 Rotunda, Nowak and Young, Treatise on Constitutional Law: Substance and Procedure § 15.8 (1986).

Despite the narrow scope of the contract clause envisioned by the framers, the United States Supreme Court has historically given the clause a more expansive interpretation. The Supreme Court first considered the meaning of the clause in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L. Ed. 162 (1810), a case which arose out of the notorious Georgia Yazoo land scandal of the 1790's. In an opinion written by Chief Justice John Marshall, the Court held invalid an attempt by the Georgia legislature to annul land titles granted by a previous legislature which had been subjected to fraud and bribery. Although the decision of the Court was based at least partially upon the contract clause, Justice Marshall also utilized "general principles" of society and government and the concept of natural law. Thus, it was still uncertain whether the contract clause, standing alone, could prohibit legislation impairing the obligation of a state to a private party.

This uncertainty was resolved some nine years later in one of the most important and famous decisions rendered under the contract clause, *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L. Ed. 629 (1819). There, the Court applied the contract clause to invalidate a New Hampshire statute which attempted to change the provisions of the corporate charter issued to the college by George III. The Court, speaking through Justice Marshall, held that a corporate charter is a contract entitled to protection under the clause. This construction of the contract clause served to protect industrial and financial corporations from legislative regulation for many years to follow. Wright, The Growth of American Constitutional Law § III (1942).

In *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 4 L. Ed. 529 (1819), the Court first applied the contract clause to the type of legislation the framers had in mind—*e.g.*, debtor relief laws. In

*Sturges,* the Court held a New York insolvency law unconstitutional which discharged debtors' obligations once they had surrendered their property. See Tribe, American Constitutional Law § 9-5 (1978). However, eight years later, in *Ogden v. Saunders,* 25 U.S. (12 Wheat.) 213, 6 L. Ed. 606 (1827), a strongly divided Supreme Court held that a debtor relief law which had prospective application was constitutional. In so holding, the majority reasoned that state laws in existence at the time a debt or other contractual obligation was incurred became part of the contract and subsequent enforcement of such laws could not impair contractual obligations.

In the late nineteenth century, the Supreme Court used the contract clause more than any other constitutional provision to invalidate state legislation. However, in the early 1900's, the contract clause fell into disuse as the Court began to rely upon competing constitutional theories such as the doctrine of substantive due process and the police power as a basis for softening the claimed harshness of the contract clause. See Note, *A Process-Oriented Approach to the Contract Clause,* 89 Yale L.J. 1623 (1980).

In the 1930's, states enacted debtor relief laws as a way of dealing with the Depression, and the contract clause was again relied upon as a means of attacking such legislation. Perhaps the most important case decided during that period (and the one most relevant to our consideration of the case at bar) was *Home Bldg. & L. Assn. v. Blaisdell,* 290 U.S. 398, 78 L.Ed. 413, 54 S. Ct. 231 (1934). At issue in *Blaisdell* was a Minnesota law which gave state courts authority to extend a landowner's redemption period after a real estate mortgage foreclosure sale from eighteen months to three years. During the period of extension, the mortgagor was allowed to remain in possession but was required to pay the reasonable rental value of the property, as fixed by the court, toward the payment of the mortgage debt, interest, taxes, and insurance.

In upholding the mortgage foreclosure moratorium, the court recognized "the necessity of finding ground for a rational compromise between individual rights and public welfare." 290 U.S. at 442. This "compromise" is more thoroughly discussed at page 439 of the opinion, where the court states:

"Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the State to protect the vital interests of the community."

After a detailed review of constitutional authorities, the Court concludes:

"With a growing recognition of public needs and the relation of individual right to public security, the court has sought to prevent the perversion of the clause through its use as an instrument to throttle the capacity of the States to protect their fundamental interests. This development is a growth from the seeds which the fathers planted. . . . The principle of this development is, as we have seen, that the reservation of the reasonable exercise of the protective power of the State is read into all contracts." 290 U.S. at 443-44.

Thus, it is clear from *Blaisdell* that while the contract clause appears facially absolute, it must be considered in conjunction with the reserved power of the state to protect the vital interests of the community.

Applying this criteria to the facts of *Blaisdell,* the Court determined the Minnesota statute was justified as an exercise of the State's police power. In so holding, the Court listed five factors which were significant to its analysis: (1) the existence of an emergency; (2) the legislation was addressed to a legitimate end for the protection of a basic interest of society as opposed to the advantage of particular individuals; (3) the relief afforded was of a character appropriate to the emergency; (4) the statute imposed reasonable conditions; and (5) the statute was limited to the "exigency which called it forth.", 290 U.S. at 444-47.

The "reasonable conditions" considered essential by the court were stated as follows:

"[T]he integrity of the mortgage indebtedness is not impaired; interest continues to run; the validity of the sale and the right of a mortgagee-purchaser to title or to obtain a deficiency judgment, if the mortgagor fails to redeem within the extended period, are maintained; and the conditions of redemption, if redemption there be, stand as they were under the prior law. The mortgagor during the

"extended period is not ousted from possession but he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness. The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession."

The contract clause was again asserted in the 1970's when the Supreme Court in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978), struck down a Minnesota statute which protected employees' expectations of receiving pensions. The law required that, when certain companies terminated a pension plan or closed their Minnesota plants, pension rights would vest for all employees of ten years or more.

In holding the Minnesota statute violated the contract clause, the Court applied the factors utilized in *Blaisdell* and which were given "concrete force" in three cases that followed *Blaisdell*. 438 U.S. at 243. Application of this test resulted in a determination that the Minnesota law: (1) did not deal with a broad, generalized economic or social problem; (2) did not operate in an area already subject to state regulation; (3) severely, permanently, and immediately altered contractual relationships; and (4) protected a narrow class rather than a broad societal interest. 438 U.S. at 250.

In a more recent case, *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983), the Court upheld a Kansas law which placed a statutory ceiling on price increases which a natural gas supplier could charge a public utility under the escalator clause of a pre-existing contract. The Court reasoned that to the extent the law substantially impaired contract rights, it is a narrowly tailored means of promoting an important state interest in protecting consumers from an imbalance in market prices caused by federal deregulation of natural gas prices.

Since *Energy Reserves* pertains to a regulated industry which has historically been exempt from the contract clause, it is cited only to show the clause is still recognized as a viable constitutional limitation on impairment of contract and to set out the test the Court provided for determining the contract clause's application.

The "test" provided in *Energy Reserves* was stated as follows:

"The threshold inquiry·is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' [Quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. at 244.] . . .

"If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, [citation omitted] such as the remedying of a broad and general social or economic problem. . . .

"Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" 459 U.S. at 411-12.

This test takes into account the factors applied in *Blaisdell* and *Spannaus* as well as the overriding general principle that the reservation of the State's police power must be read into all contracts.

Keeping in mind the historical context of the contract clause and the most recent statement of the criteria for determining whether a law violates the clause, we now examine the Family Farm Rehabilitation Act for the purpose of determining whether its provisions violate the contract clause of the United States Constitution.

The initial question is whether the Act operates as a "substantial impairment" of contractual relationships. If not, there is no constitutional violation, and the test ends. Several features of the Act lead us to answer this question affirmatively.

As a preliminary matter, we note that if a farmer does not redeem the mortgaged property during the stay period, the mortgage indebtedness will not be impaired. The mortgagee will still be entitled to bid on the property at a judicial sale and to obtain a deficiency judgment, if applicable. However, the problem here is the effect a redemption of the property as provided for under the Act will have upon the mortgage indebtedness. We conclude that effect is substantial and severe.

The Act authorizes an insolvent farmer to redeem the mortgaged property at a price which is the greater of the fair market value of the property determined by the court at the time of the initial hearing or at the time of redemption. This price will generally be substantially less than the judgment amount. While the Act provides its provisions shall not be construed to forgive or discharge any indebtedness of the judgment debtor, the

property subject to the mortgage or lien being foreclosed upon is specifically excepted from this rule. Further, the Act requires the farmer to be insolvent yet authorizes him to redeem the mortgaged property at a value set by the court. This provision contemplates the mortgagor obtaining title to the redeemed property free and clear of the mortgage lien, otherwise the redemption authority is meaningless. Thus, the Act seriously impairs the mortgage indebtedness, since if a farmer redeems the property, the lender is left without security for the difference between the redemption amount and the judgment amount.

Moreover, while interest continues to run during the stay period, it continues at a much lower rate than that provided under the contract. The Act provides for interest at the Treasury Bill rate plus 2% and this interest is calculated only on the fair market value of the land.

An additional impairment of the contract results from the Act's allowance of a "partial redemption." K.S.A. 1986 Supp. 2-3407 permits a farmer to redeem "any part or portion" of the agricultural land upon which execution has been stayed. Thus, the farmer could choose to redeem the most valuable portion of land and leave the mortgagee with a severed portion of little value.

Finally, the Act does not provide sufficient protection for the mortgagee, and lacks the "reasonable conditions" contained in the debtor relief legislation upheld in *Blaisdell*. Specifically, the farmer is permitted to remain in possession of the property, yet he is not required to pay rent or taxes or account for profits. While the Act requires the court to specify "methods of providing adequate protection" for the agricultural land or property, it does not obligate the court to order the payment of taxes or rent or the accounting of profits. Thus, the potential for abuse is great and the legislation does not specifically protect the mortgagee.

We conclude that the Family Farm Rehabilitation Act substantially impairs the contractual relationship between the mortgagor and mortgagee because the Act (1) impairs the mortgage indebtedness; (2) alters the contract rate of interest; (3) permits partial redemption of the mortgaged property; and (4) provides inadequate protection for the mortgagee. This makes K.S.A. 1986 Supp. 2-3401 *et seq.* facially unconstitutional according to *Blaisdell*.

However, the next two prongs of the test, taken together, can restore the law's constitutionality. Under the second prong of the *Energy Reserves* test, we must determine whether there is a significant and legitimate public purpose behind the legislation. The stated purpose of the Act is to assist in stabilizing agricultural conditions. There can be no doubt there is a serious depression in agriculture. High interest rates, inflation, overproduction, and low commodity prices threaten the stability of the entire industry. Agriculture's stability affects the well-being of all Kansans. None of the parties to this appeal, including the Federal Land Bank, disagree that the public purpose exists. Thus, we hold there is such a significant and legitimate public purpose behind the legislation to justify the legislature in exercising its police power to assist the troubled agricultural industry.

This now brings us to the third prong of the *Energy Reserves* test—whether the impairments to the contracting parties' rights and responsibilities are based upon "reasonable conditions" and are of a "character appropriate to the public purpose" to justify the legislation's adoption. In other words, even though the impairment of contract by the legislature is justified under the police power to satisfy a significant public purpose, is the remedy reasonable and appropriate to accomplish the desired result?

The standards of "reasonable conditions" set out in *Blaisdell* are determinative of this question. *Blaisdell* considered it essential that the integrity of the mortgage indebtedness not be impaired; that the interest pursuant to the contract continue to run; that the mortgagee have the right to a title to the security or to obtain a deficiency judgment; that the conditions of redemption, if it occurs, stand as they were under the prior law; and that the mortgagor, if he retains possession during the extended redemption period, pay a reasonable rental.

K.S.A. 1986 Supp. 2-3401 *et seq.* impairs the mortgage debt by authorizing redemption at less than the judgment amount and preventing the mortgagee from bidding at a judicial sale or obtaining a deficiency judgment. It changes the rate of interest from that provided in the contract to a set rate provided in the Act. The conditions of redemption are changed as the Act authorizes redemption of any part or parcel of the mortgaged land.

Further, the Act makes no specific provision for the payment of taxes, profits, or reasonable rental during the period of extended redemption. Finally, under K.S.A. 1986 Supp. 2-3401 *et seq.*, all institutions and persons making farm loans would cease doing so because the statute impairs the security for such loans.

For the foregoing reasons we hold the Family Farm Rehabilitation Act, K.S.A. 2-3401 *et seq.*, unconstitutionally impairs the contract between mortgagor and mortgagee in violation of Article I, Section 10 of the United States Constitution. Although the Act provides that if any part or parts of the Act are found to be unconstitutional, the remainder of the Act is presumed to be constitutional, we do not so hold. The constitutional deficiencies which we have delineated here—particularly the lack of "reasonable conditions" for the protection of the mortgagee—permeate the entire Act. Accordingly, we are unable to apply the severability clause of the Act.

We mention in passing that the United States Congress, which is unrestrained by the contract clause, recently enacted a new chapter to the Bankruptcy Code—Chapter 12—for the benefit of economically depressed farmers. Adjustments of Debts of a Family Farmer with Regular Annual Income, Pub. L. No. 99-554, Sec. 255, 99th Cong., 2d Sess., 10A U.S. Code Cong. & Ad. News, Dec. 1986 (to be codified at 11 U.S.C. § 1201 *et seq.*). It may furnish some relief for persons such as the defendants here.

The judgment of the district court is affirmed.

SCHROEDER, C.J., and ALLEGRUCCI, J., not participating.