No. 80,000

BOARD OF EDUCATION OF UNIFIED SCHOOL DISTRICT No. 443,
FORD COUNTY, KANSAS, *Appellant*, v. KANSAS STATE BOARD
OF EDUCATION, *et al.*, *Appellees*.

(966 P.2d 68)

 Opinion filed
October 30, 1998. 

*Ken W. Strobel*, of Williams, Strobel, Malone, Mason & Ralph, P.A., of Dodge City, argued the cause and was on the brief for appellant.

*Ward Loyd*, of Ward Loyd Law Offices, L.L.C., of Garden City, argued the cause, and *Bradley W. Maudlin*, of the same firm, was with him on the brief for appellees Southwest Kansas Area Cooperative District No. 613 and Identified Member School Districts.

*Dan Biles*, of Gates, Biles, Shields & Ryan, P.A., of Overland Park, argued the cause, and *Rodney J. Bieker*, general counsel for the Kansas Department of Education, was with him on the brief for appellee Kansas State Board of Education.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by Unified School District No. 443 (USD 443), Ford County, Kansas. USD 443 asserts that the 1987 amendment to K.S.A. 72-8230 unlawfully impairs its right to unilaterally terminate its participation in an interlocal cooperative agreement with 15 other school districts. The statute at issue extended an interlocal agreement between the districts that terminated by its own terms in 1989. USD 443 argues that the amended statute violates both the United States and Kansas Constitutions.

## I. BACKGROUND

Both Kansas and federal law require that school districts provide certain special education services to "exceptional children" or other qualifying students enrolled in their respective districts, *i.e.*, K.S.A. 72-966(a) and 20 U.S.C. 1400 *et seq.* The term "exceptional children" encompasses a wide spectrum of children from those who have severe physical or mental challenges to gifted children.

School districts in Kansas may provide the education services for exceptional children in one of three ways (or a combination of the three):

1. By a "stand alone" program, *i.e.*, where the district provides the educational programs and services to only its own students;

2. Through a cooperative, *i.e.*, one district serves as a sponsoring district and other districts share the cost;

3. Through an interlocal agreement (also a cooperative but referred to as an "interlocal"), *i.e.*, an independent legal entity known as an "interlocal" provides the special education services to all member districts. Both the "cooperative" and "interlocal" are created by contractual agreements among the member districts which are participating in the programs.

USD 443 appears to be the only district in Kansas with a full-time equivalent enrollment of over 3,000 students that does not have a "stand alone" or "cooperative" program to provide the required education services.

USD 443 and some of the districts involved in this case formed an interlocal. The interlocal entity formed is Southwest Kansas Area Cooperative District No. 613 (SKACD). SKACD was a successor to a cooperative district in which Dodge City had been the sponsoring district. In the late 1970's the interlocal was formed. As required by the law in effect at that time, the agreement was limited to a term of years (not less than 3 nor more than 5). After several successor agreements, the 16 school districts involved in this case signed an interlocal agreement in 1986, which by its express terms was to expire June 30, 1989.

In 1987, the legislature amended K.S.A. 72-8230(a) in pertinent part as follows:

"(5)(A) The duration of a school district interlocal cooperation agreement for joint or cooperative action in providing special education services *shall be perpetual* unless the agreement is partially or completely terminated in accordance with this provision. This provision applies to every school district interlocal cooperation agreement for the provision of special education services entered into under authority of this section after the effective date of this act *and to every such agreement entered into under this section prior to the effective date of this act, and extant on the effective date of this act, regardless of any provisions in such an agreement to the contrary.*" (Emphasis added.) L. 1987, ch. 276, § 1.

Thus, by such amendment, the 1986 interlocal agreement to which USD 443 was a party became, by operation of law, a perpetual agreement and could be terminated only by approval of the State Board of Education (State Board) in accordance with the procedures as set forth in the statute. Consequently, USD 443 was statutorily prohibited from unilaterally withdrawing from the in-

terlocal agreement effective June 30, 1989 (the expiration date), by virtue of the above statutory amendments.

The legislative history shows that when the committees were considering the 1987 amendment, Gary Bishop, Director of SKACD, appeared before a legislative committee and spoke in favor of the amendment in question. He testified that additional units "may be responsible for additional costs" and that "coop break-up may not always be for sound educational reasons." He also testified that since the State pays about one-half of the total cost, it should have some control over the make-up of the special education administrative units.

SKACD apparently functioned well until sometime in the 1990's. Although it is of no import to this opinion, SKACD's relations with USD 443 did not improve when SKACD responded to USD 443's demand for rent for some 5,000 square feet of space owned by USD 443 and used as SKACD's administrative offices by moving the office to Ensign, Kansas. As a result of this move, the three administrators, office staff, and educational materials were no longer available in Dodge City, where 50% of the students who were served by SKACD lived.

USD 443 attempted to negotiate some changes in the interlocal agreement (discussed later), and when negotiations were unsuccessful, it attempted to withdraw from SKACD. USD 443 attempted to withdraw in 1995, some 8 years after the amendment to K.S.A. 72-8230(a) took effect, and after operating under the interlocal agreement for some 6 years after the legislature had statutorily extended it.

SKACD denied the request of USD 443 to withdraw by a vote of 13 to 1, with USD 443's vote being the only one in favor of the withdrawal. As authorized by K.S.A. 72-8230(a)(6)(B), USD 443 appealed SKACD's denial to the State Board. The State Board appointed a three-person panel to hear the appeal. Only two issues were presented: whether the statutory mandates that the State Board in approving or disapproving a complete or partial termination must find was in (1) the best interests of the involved school districts, and (2) in the best interests of the state as a whole in

providing special education services for exceptional children. See K.S.A. 72-8230(a)(6)(D).

Before the hearing panel, USD 443 raised the issue that the amendment was contrary to both the federal and state Constitutions because the amendment interfered with contractual rights. All parties recognized that the State Board, as an administrative agency, could not raise or rule upon this.

Although largely irrelevant to this appeal, USD 443 asserted three main reasons for its withdrawal from SKACD. First, USD 443 wanted to run its own program or have weighted voting. It is about seven times larger than the next largest participating district in SKACD and 66 times larger than the smallest participating district. SKACD has a 16-member board and USD 443 has only 1 member on the board. Thus, USD 443 has only one vote, although it has 50% of the students and pays almost 50% of SKACD's budget that is paid by the members. (The state and federal governments appear to pay over 50% of the budget and that percentage does not include the sum paid by the State to each district for each full-time student.) Apparently, one-half of the staff is employed in Dodge City, but the three administrators, office staff, and educational materials are in Ensign. No special education services are provided by SKACD in Ensign.

The second argument of USD 443 centers around the concept of weighted funding. The smaller districts receive a larger sum per pupil than USD 443. In fact, the districts, due to the size of qualifying enrollment, do not all receive the same amount per pupil. USD 443 wanted each district's assessment to SKACD to be based on weighted funding received by each district.

Finally, USD 443 wanted one administrator assigned exclusively to USD 443 and located at USD 443 offices. USD 443 also presented other evidence as to the best interests of the involved school districts and of the State as a whole, as did SKACD.

The hearing panel filed its written report with the State Board, recommending denial of USD 443's request to withdraw from SKACD. The State Board adopted the panel's recommendation verbatim and denied the appeal filed by USD 443 to withdraw as a member of SKACD. The State Board thus found it would not be

in the best interests of the involved school districts or of the State as a whole to grant the requested withdrawal.

USD 443 appealed to the District Court of Shawnee County, and it upheld the State Board's decision. A review of the findings of fact to support the findings of the State Board is not necessary because USD 443 is not appealing based on grounds involving the facts.

## II. ISSUES

USD 443 raises three issues on appeal.

1. Was USD 443's 1986 contract with the other interlocal districts impaired within the meaning of and in violation of the provisions of Article I, § 10 of the United States Constitution?

2. Did the 1987 amendment to K.S.A. 72-8230 violate USD 443's rights under the Fifth and Fourteenth Amendments to the United States Constitution and § 1 of the Kansas Constitution Bill of Rights?

3. Did the district court err in refusing to address and decide the state constitutional issue in its judicial review of the state agency action?

USD 443 appealed the State Board's decision to the district court pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. Where a district court's decision is appealed under this Act, "we review the Board's decision as though the appeal has been made directly to us, and we are subject to the same limitations of review as the district court." *Butler v. U.S.D. No. 440*, 244 Kan. 458, 464, 769 P.2d 651 (1989). Constitutional issues present a unique situation, however, because administrative boards and agencies may not rule on constitutional questions. Therefore, "the issue of constitutionality must be raised when the case is on appeal before a court of law." *In re Residency Application of Bybee*, 236 Kan. 443, Syl. ¶ 4, 691 P.2d 37 (1984). Thus, the district court had de novo review of the constitutionality of the 1987 amendment to K.S.A. 72-8230. Consequently, we review de novo the district court's findings involving issues of constitutionality. An issue of whether a statute violates a constitutional provision is a question of law, and an ap-

pellate court's scope of review of questions of law is unlimited. *Injured Workers of Kansas v. Franklin,* 262 Kan. 840, Syl. ¶ 1, 942 P.2d 591 (1997).

The issues in this case, with the exception of the issue of whether the district court abused its discretion in refusing to rule on the state constitutional issue, challenge the constitutionality of legislation on various grounds. Accordingly, the judiciary's role is very limited in its scope.

Art. 6, § 1 of the Kansas Constitution states that "[t]he legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law." Art. 6, § 2(a) mandates:

"The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents. The state board of education shall perform such other duties as may be provided by law."

Art. 6, § 5 expresses the power of the local school boards:

"Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature."

K.S.A. 72-8230(a)(4) states that "[a] school district interlocal cooperation agreement shall be subject to change or termination by the legislature." The original enabling statute, K.S.A. 1975 Supp. 72-8230(e), also provided that "[a]ny such agreement shall be subject to change or termination by the legislature." Likewise, K.S.A. 1975 Supp. 72-8230(d) mandated that "[a]ny such agreement shall be effective only after approval by the state board of education."

At the outset, we question whether we should consider the appeal. Here, USD 443 was a member of SKACD, and SKACD, with no apparent objection by USD 443, appeared before a legislative committee and urged passage of the amendment in question.

Then, for 2 years before the interlocal agreement terminated on its own terms, USD 443 made no effort to challenge the statute. After that amendment went into effect and extended the contract, subject to modification or termination in whole or in part by agreement of the parties or by action of the State Board, USD 443 did nothing to challenge the constitutionality of the statute for 6 more years. It was not until 8 years after the statute was amended that USD 443 challenged the statute. In the interim, it operated according to the statute and the interlocal agreement extended by the statute, met its obligations, and accepted the benefits of that interlocal agreement.

Generally, such conduct and failure to act will result in the issue being considered as waived. See *Owen v. Mutual Ben. Health & Acc. Ass'n*, 171 Kan. 457, 233 P.2d 706 (1951), and *Leavenworth-Jefferson Electric Co-op v. Kansas Corp. Comm'n*, 247 Kan. 268, 797 P.2d 874 (1990). The parties have not had an opportunity to brief that issue; thus, we exercise our discretion to decide the matter on its merits.

Here, the State Board contends that USD 443 has no standing, since it is created by the legislature as a political subdivision of the State, to challenge whether the State impaired a contract with USD 443. *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 845 P.2d 676 (1993), however, permitted U.S.D. 380 to challenge whether it was denied the protection of the Kansas Constitution even though it was a political subdivision of the State. Therefore, although a school district's duties are not self-executing, but dependent upon statutory enactment of the legislature, this does not mean that the school district is stripped of the right to challenge the statute's constitutionality, nor is it removed from the protection of the constitution.

Kansas case law does not mandate a rule that a school district is removed from a claim of contractual impairment; thus, the district court correctly held, on the facts unique to this case, that a school board's freedom of choice and power to enter an interlocal agreement bestowed upon it by Art. 6, § 5 of the Kansas Constitution, makes it subject to a claim of contractual impairment.

USD 443 claims that it has a vested right, by virtue of the state constitution, to enter into cooperative agreements with other districts to provide educational services, including the provision of special education service. Because the language of Art. 6, § 5 of the Kansas Constitution is permissive rather than mandatory, USD 443 reasons that implicit in the permissive right to enter into such contracts is the permissive right to withdraw.

In *Federal Land Bank of Wichita v. Bott*, 240 Kan. 624, 732 P.2d 710 (1987), the court relied on *Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398, 78 L. Ed. 413, 54 S. Ct. 231 (1934), and *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983), and set out the criteria for determining whether a state law violates the contract clause. The *Bott* court stated:

"The test for determining whether a state law violates the contract clause of the United States Constitution is whether: (1) The state law has, in fact, operated as a substantial impairment of a contractual relationship; (2) whether there is a significant and legitimate public purpose behind the legislation; and (3) whether the adjustment of the contracting parties' rights and responsibilities is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." 240 Kan. 624, Syl. ¶ 4.

The *Bott* court noted that although Art. I, § 10 of the United States Constitution "appears facially absolute, it must be considered in conjunction with the reserved power of the state to protect the vital interests of the community." 240 Kan. 624, Syl. ¶ 3. Further, the *Bott* court explained:

"Historically, the contract clause of the United States Constitution was adopted to prohibit the states from enacting laws which 'impair the obligation of contracts.' This prohibition has been construed as preventing the states from passing any statute which will alleviate the commitment of one party to a contract or which interferes with the enforcement of the contract." 240 Kan. at 629.

The *Bott* court stated that the Family Farm Rehabilitation Act (Act) is a debtor relief law and the "motive for adoption of the contract clause was to prohibit states from retroactively interfering with contracts between private parties." 240 Kan. at 629. The Act authorized the stay of enforcement of certain judgments relating

to land and property used in farming operations and provided for redemption of that land in certain cases.

The *Bott* court stated that the legislation may still be upheld as constitutional, despite a substantial impairment finding, if "there is a significant and legitimate public purpose behind the legislation," and if "the impairments to the contracting parties' rights and responsibilities are based upon 'reasonable conditions' and are of a 'character appropriate to the public purpose' to justify the legislation's adoption." 240 Kan. at 636. *Bott* ultimately held that although the legislature's attempt to stabilize economic conditions and to assist a troubled agricultural industry was a significant and legitimate public purpose, "[t]he impairments to the contracting parties' rights and responsibilities resulting from the [Act] . . . are not based upon 'reasonable conditions' nor are they of a character appropriate to the public purpose justifying the legislation's adoption." 240 Kan. 625, Syl. ¶¶ 6 and 7.

In *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 57 L. Ed. 2d 727, 98 S. Ct. 2716, *reh. denied* 439 U.S. 886 (1978), the United States Supreme Court analyzed whether the Minnesota Private Pension Benefits Protection Act required private companies that stopped operation or terminated their pension plans to nevertheless pay a pension to employees who had worked for a company for 10 or more years. The Minnesota Act required companies to pay a pension to an employee even if an employee's right to receive a pension had not yet vested according to the requirements of an individual company's pension plan. 438 U.S. at 239. The Court first stated that Minnesota's legislation substantially altered the contractual relations of Allied Structural Steel (the company) with its employees "by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake. But it does not inexorably follow that the Act, as applied to the company, violates the Contract Clause of the Constitution." 438 U.S. at 240. The *Spannaus* Court pronounced:

"First of all, it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the

promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' *Manigault v. Springs*, 199 U.S. 473, 480." 483 U.S. at 241.

The *Spannaus* court ultimately held that the Act violated the Contract Clause because it was not enacted to deal with a broad, generalized economic or social problem; it operated in an area that was not subject to state regulation when the company's contractual obligations were originally undertaken, but invaded an area that had never before been subject to state regulation; it created irrevocable and retroactive changes in the company's contractual relationships; and it was not aimed "at every Minnesota employer, not even every Minnesota employer who left the state, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees." 438 U.S. at 250.

USD 443 argues that the district court decided that there was no Contract Clause violation solely because there was no economic impairment, and economic impairment is not a necessary element for a Contract Clause violation. The district court provided an extensive analysis of the Contract Clause and ruled that there was no economic impairment, but it cannot be said that this was the only reason for the district court finding that there was no Contract Clause violation. The constitutionality of the 1987 amendment passes the test set out in *Bott*.

If an impairment is not significant, our analysis ends and there is no violation of the Contract Clause. Assuming a significant impairment, the statute here is nonetheless saved from a declaration of unconstitutionality because a valid public purpose exists for restricting school districts from withdrawing from interlocal agreements. Further, in accordance with the *Bott* test, the statute, as amended in 1987, is reasonable because it does not unequivocally prohibit a school district's withdrawal. Rather, the 1987 amendment mandates that the State Board must approve the withdrawal,

after considering the adverse impact on all school districts and the State as a whole.

The legislature's grant of power to the State Board, by virtue of the 1987 amendment, to approve or disapprove a withdrawal based on the criteria set out in the same statute, is also reasonable, given that the Kansas Constitution specifically provides for a State Board with broad authority. The legislative history of the 1966 amendments to Art. 6 of the Kansas Constitution shows that the creation of a powerful State Board was one of the intentions of the 1966 changes. In a detailed report, *Implementation of the Education Amendment-A Report of the Education Advisory Committee to the Committee on Education on Proposal No. 45* (Publication No. 260, November 1966), the committee characterized the functions conferred on the State Board as of "such magnitude and importance that people of outstanding ability and experience will be needed as members." The committee also noted that the State Board would "exercise some quasi-legislative and quasi-judicial powers in adopting rules and regulations and reviewing disagreements or conflicts between local educational agencies or interests." *Report of the Education Advisory Committee*, p. 8.

In the present case, USD 443's interlocal agreement with the 15 other school districts provided that the agreement would terminate on June 30, 1989. Here, the school districts knew before the 1987 amendment was promulgated that statutory provisions for interlocal agreements were subject to legislative change or termination. Also, the language of the school districts' contract states as a condition that "[t]his agreement is subject to change or termination by the Legislature." Thus, the parties expressly provided for the legislature's actions in their own contract. Therefore, no impairment of contract is created simply because the legislature indeed took the action of changing the agreement.

*Gragg v. U.S.D. No. 287*, 6 Kan. App. 2d 152, 627 P.2d 335 (1981), dealt with a teacher's claim that an unlawful modification to his teaching contract occurred when the legislature changed the date for automatic renewal under K.S.A. 72-5412, the continuing contract law. The *Gragg* court stated:

" 'One who makes a contract with a municipal corporation is bound to take notice of limitations on its power to contract and also of the power of the particular officer or agency to make the contract. The municipal corporation cannot in any manner bind itself by any contract which is beyond the scope of its powers, and all persons contracting with the corporation are deemed to know its limitations in this respect.' " 6 Kan. App. 2d at 155 (quoting *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, Syl. ¶ 8, 479 P.2d 875 [1971]).

This rule would apply to multiple "municipal corporations" contracting with each other, such that they cannot bind themselves by a contract in a manner that is beyond the scope of their powers. In the case before us, the Kansas Constitution and K.S.A. 72-8230 limit USD 443's ability to enter into an interlocal agreement because both the Kansas Constitution and the statute provide for continuous legislative modification or termination. Thus, the legislature not only had the right to amend K.S.A. 72-8230, but USD 443 had notice that the legislature had this right.

In conclusion, the 1987 amendment to K.S.A. 72-8230 does not violate Art. I, § 10 of the United States Constitution by making USD 443's interlocal agreement retroactively perpetual in duration, unless a withdrawal is approved by the State Board as being in the best interests of the member school districts and the State as a whole in providing special education services.

USD 443 argues that the 1987 amendment to K.S.A. 72-8230 denied it substantive due process and equal protection because freedom of contract is a right protected under the Fifth and Fourteenth Amendments. USD 443 further asserts that this court should analyze the constitutionality of the 1987 amendment using the strict scrutiny test. Application of strict scrutiny requires the State to show a compelling State interest for the discriminating legislation and that the challenged legislation is narrowly tailored to meet that compelling interest.

USD 443's argument for application of the strict scrutiny test is fundamentally flawed. The strict scrutiny test applies to suspect categories and fundamental rights. USD 443 cites *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 643 P.2d 87 (1982), as support that freedom of contract is a fundamental right. The *Hurley* court acknowledged that freedom of contract is a protected

right, but not an absolute right. 231 Kan. at 28. The appropriate test to analyze whether the 1987 amendment to the statute violates USD 443's Fifth and Fourteenth Amendment rights by interfering with its freedom of contract is whether the contested legislation bears a rational relationship to a legitimate State interest. See *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, 123, 853 P.2d 669 (1993). Thus, the question becomes whether the 1987 amendment making interlocal agreements perpetual unless a district satisfies the State Board that its withdrawal from the interlocal is in the best interests of the contracting school districts and the State as a whole, bears a rational relationship to accomplishing a legitimate State interest.

The State clearly has not only a legitimate but a compelling interest in providing special education services to exceptional children. The 1966 amendments to the education provisions of the Kansas Constitution and the legislative history behind the constitutional amendments illustrate the overwhelming State interest in education. USD 443 argues that the 1987 amendment is not reasonably or rationally related to the objective of providing special education services and violates its due process and equal protection rights, even under the rational basis analysis.

During hearings on H.B. 2443 and H.B. 2482, which proposed the 1987 amendment, the House Committee on Education heard testimony from various individuals involved in some way with education in Kansas. Olan Burnett, on behalf of USD 501, "encouraged the committee to vote favorably on both HB 2443 and HB 2482, saying there's an adverse effect on any of the other districts statewide anytime there's a breakup of a coop and additional staff has to be employed." (House Committee on Education Minutes, March 2, 1987, p. 2.) Don Nigus, on behalf of the High Plains Education Cooperative, stated that both bills "would help limit and put a lid on some of the funding of special education." (House Committee on Education Minutes, March 2, 1987, p. 2.) Kenneth Brendt, on behalf of Schools for Quality Education,

"presented data related to special education cooperatives as of March 1986. . . . He supported HB 2443 and HB 2482 saying these bills will get the State Board of Education to set up quality and efficient standards that organizations

must meet to update categorical funding approval. These standards and approved process are extremely important to get a handle on the rising costs of special education." (House Committee on Education Minutes, March 2, 1987, p. 2.)

As noted earlier, Gary Bishop, Director of SKACD, spoke in favor of the bills, noting the number of Special Education administrative units is increasing. (House Committee on Education Minutes, March 2, 1987, p. 2.)

The testimony regarding the justification for passage of the bills leading to the 1987 amendment supports a finding that it was a reasonable method to attain the legitimate State objective of providing the best special education services at the most economical cost to the State, the school districts, and the taxpayers. Further, the 1987 amendment is reasonably related to the State's compelling interests in education because it does not categorically prevent a school district from withdrawing from an interlocal, but mandates that before a school district may withdraw, the State Board must find that such a withdrawal is in the best interests of the cooperating school districts as well as the State as a whole in providing special education services.

The district court ruled that it would not consider whether the 1987 amendment to K.S.A. 72-8230 violated the Kansas Constitution because USD 443 had failed to specifically allege the state constitutional issue in its original petition and brief for judicial review, and, therefore, the issue was not properly before the court. "Since administrative boards and agencies . . . may not rule on constitutional questions, the issue of constitutionality must be raised when the case is on appeal before a court of law." *In re Residency Application of Bybee*, 236 Kan. 443, 449, 691 P.2d 37 (1984). See *Zarda v. State*, 250 Kan. 364, 826 P.2d 1365, *cert. denied* 504 U.S. 973 (1992). Specifically, the court stated in its memorandum opinion and entry of judgment that "it should be made clear that Petitioner/Appellant did not directly challenge the 1987 amendment on State constitutional grounds in its Petition although it was free to do so and probably was fairly required to do so to obtain review of such a complex and important issue."

In *University of Kansas v. Department of Human Resources*, 20 Kan. App. 2d 354, Syl. ¶ 3, 887 P.2d 1147 (1995), the court stated

that "K.S.A. 77-614(b) provides that a petition for judicial review of agency actions shall include the petitioner's reasons for believing that relief should be granted and a request for relief, specifying the type and extent of relief requested." Upon examining the record as a whole, USD 443 did not specifically raise the state constitutional issue in its petition for judicial review. USD 443 raised the issue in its reply brief to the trial court. USD 443 argues that under the constitutional language of Art. 6, §§ 2 and 5, the State Board's authority is limited to "general supervision" over the exercise of powers by local school districts and that by the enactment of the 1987 amendment, the legislature attempted to establish in the State Board powers well beyond its general supervisory powers enunciated in the Kansas Constitution.

The district court should not have dismissed the state constitutional issue because the KJRA applies to the actions of the State Board as a State agency not specifically exempted from the KJRA. K.S.A. 77-603(a). One of the statutory reasons in which a district court shall grant an appealing party relief from the actions of an agency is that "[t]he agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied." K.S.A. 77-621(c)(1). More importantly, the general rule is qualified by the following exception:

" ' "The constitutionality of a statute should be considered in any action where it is necessary in order to determine the merits of the action or where the issues cannot be intelligently decided without doing so, notwithstanding the failure of the parties to raise the constitutional question, failure to plead the question, or failure to present the question to the trial court." [Citation omitted.]' " *In re Marriage of Soden*, 251 Kan. 225, 231, 834 P.2d 358, *cert. denied* 506 U.S. 1001 (1992).

We note that USD 443 raised the issue (in a vague way) before the hearing panel and again in its trial reply brief. The trial judge was fully justified in holding that the issue was not properly raised. However, we hold it is necessary to consider the state constitutional claim in order to determine the merits of the action.

"Interpretation of a statute is a question of law, and our review is unlimited." *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). Also, "[w]hen determining a question

of law, this court is not bound by the decision of the district court." *Memorial Hospital Ass'n, Inc. v. Knutson,* 239 Kan. 663, 668, 722 P.2d 1093 (1986). Further,

"A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute. *Peden v. Kansas Dept. of Revenue,* 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997).

USD 443 claims that its constitutional rights to equal protection and due process of law under § 1 of the Kansas Constitution Bill of Rights have been violated by the 1987 retroactive amendment.

§ 1 of the Kansas Constitution Bill of Rights provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "finds its counterpart in Sections 1 and 2 of the Bill of Rights of the Kansas Constitution." *State ex rel. Tomasic v. City of Kansas City,* 237 Kan. 572, Syl. ¶ 12, 701 P.2d 1314 (1985).

USD 443 makes the sweeping argument that the 1966 change to Art. 6, § 5 of the Kansas Constitution changed the status of local school boards from subordinate state agencies totally controlled by the legislature, to school boards vested with the responsibility of local control of maintenance, development, and operation of local public schools under their jurisdiction. Thus, USD 443 contends that, as a local school board, it has the *right* to contract with other school boards to accomplish the responsibilities vested in it. Further, USD 443 asserts that Art. 6, § 5 of the Kansas Constitution changes the status of local school boards such that the constitutional rights of equal protection and due process should apply to them and such rights should be recognized by the courts.

The powers and duties of local school boards under Art. 6, § 5 of the Kansas Constitution are not self-executing. In *U.S.D. No. 229 v. State,* 256 Kan. 232, 885 P.2d 1170 (1994), the court explained:

"In *U.S.D. No 380 v. McMillen*, 252 Kan. 451, 845 P.2d 676 (1993), at issue was the apparent conflict between Article 6, §§ 1 and 5. The former places responsibility for maintaining public schools with the legislature, while the latter places it with the locally elected school boards. The challenged statute (K.S.A. 72-5443) provides for a hearing panel to make a final decision on the firing of a teacher, subject to judicial review. In upholding the statute, we said:

'It appears clear that the legislature under § 1 of Article 6 has the broad duty of establishing the public school system. The local school board's duties under § 5 of Article 6 are not self-executing but are dependent upon statutory enactments of the legislature. . . .' " 256 Kan. at 252-53.

In *U.S.D. 229*, the court affirmed that *McMillen* was controlling on the issue that a school board's duties under § 5 of Article 6 are not self-executing. 256 Kan. at 253. Thus, the State Board declares that a district has the power to contract only "when authorized by law." Kan. Const. Art. 6, § 5. Further, it contends, this grant of authority is statutorily made, and Art. 6, § 5 specifically states that when school boards enter into agreements for cooperative operation and administration of educational programs, such agreements "shall be subject to change by the legislature." Consequently, the State Board avers that USD 443's argument that its authority to contract has been unconstitutionally impaired fails because it only has authority to contract under the constitutional mandate that while such agreements, or contracts, may be made, they shall be subject to the legislature's authority to limit, change, or even terminate an agreement. Additionally, USD 443's contract with the other districts in 1986 stated that "[t]his agreement is subject to change or termination by the legislature."

Art. 6, § 5 of the Kansas Constitution provides for local public schools and states:

"Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature."

USD 443 argues that this language of the Kansas Constitution is permissive, not mandatory, in permitting school boards to enter into contracts with other schools to provide educational services.

Therefore, USD 443 concludes that because it has the right to decide whether to enter into cooperative agreements, it has the implicit right to withdraw from such contracts based on the provisions of the contract itself. Extending this logic, it asserts that its right to enter into and withdraw from such contracts is vested in USD 443 by virtue of the Kansas Constitution and such a vested right cannot be legislatively withdrawn without due process and equal protection of the law.

Art. 6, § 5 of the Kansas Constitution provides that local school boards "may make and carry out agreements for cooperative operation and administration of educational programs." If the constitutional provision provided nothing further, USD 443's contention might have merit. The continuation of this phrase, however, strips any legitimacy from USD 443's argument that the Kansas Constitution provides it with a vested right to enter and withdraw from cooperative agreements. The right to make and carry out cooperative agreements is qualified by "general supervision of the state board of education." Most importantly, the constitutional provision which USD 443 argues provides it with a vested right, specifically states that "such agreements shall be subject to *limitation, change* or *termination* by the legislature." (Emphasis added.) Therefore, USD 443 does not have a vested right to enter and withdraw from cooperative agreements such as SKACD. A right is not vested if it can be terminated, limited, or changed at any time. USD 443 had the power to enter into an interlocal agreement, but the same constitutional phrase allowing such an agreement is premised on the foundation that the legislature has the power to limit, change, or amend the agreement.

In this case, there could not have been an expectation that the power to enter or dissolve an agreement was absolute. A vested right means that there is an expectation of permanency. In *Stoldt v. City of Toronto*, 234 Kan. 957, 964, 678 P.2d 153 (1984), the court stated that "only vested rights have a sufficient property interest to require due process protection." In *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 364, 892 P.2d 497 (1995), this court stated that "[o]ne commentator has aptly noted: '[I]t has long been recognized that the term "vested right" is conclusory—a right

is vested when it has been so far perfected that it cannot be taken away by statute.' " (Citing Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 692, 696 [1960].) The *Resolution Trust Corp.* court cited *State, ex rel., v. School District*, 163 Kan. 650, 185 P.2d 677 (1947), as an example wherein the court found that there are no vested rights in the existence of a school district. 257 Kan. at 365.

The Kansas Constitution does not grant local school districts any inherent absolute power. Art. 6, § 5 grants constitutional authority for locally elected school boards to maintain, operate, and develop local public schools. This power is qualified, however, in that such authority exists only "under the general supervision of the state board of education." Similarly, a local school board's capability to make and carry out agreements for cooperative operation and administration of educational programs is not an absolute power. Its authority to make and carry out such agreements is subject to the following restrictions: "[w]hen authorized by law," "under the general supervision of the state board," and "such agreements shall be subject to limitation, change or termination by the legislature."

The State Board's role in the governance of local school districts, however, is established by constitutional fiat. Art. 6, § 2 (a) of the Kansas Constitution states:

"The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents. The state board of education shall perform such other duties as may be provided by law."

The next question is whether the legislature could constitutionally grant the State Board the power to approve or disapprove a school district's withdrawal from an interlocal agreement. The legislative history of the 1966 Amendments to the Education Article of the Kansas Constitution suggests that the State Board has broad authority and that such a grant of power is within the scope of the constitutional provision establishing a State Board of Education.

In 1965, the Education Advisory Committee recommended the new Article 6 to the Kansas Constitution, and the voters adopted the present version of Article 6 in 1966. The Advisory Committee

studied "educational problems and procedures in the process of drafting the amendment and statutory policy recommendations to implement it." Kansas Legislative Council, *Implementation of the Education Amendment-A Report of the Education Advisory Committee to the Committee on Education on Proposal No. 45*, p. vi (Publication No. 260, November 1966). The Advisory Committee stated:

"The new article gives constitutional status, for the first time, to an elected State Board of Education of 10 members, an appointed State Board of Regents of nine members, and to local Boards of education. At the same time, the amendment reaffirms the inherent powers of the legislature — and through its members, the people—to shape the general course of public education and provide for its financing." Report of the Education Advisory Committee, p. vii (Publication No. 260, November 1966).

In *State, ex rel., v. Board of Education*, 212 Kan. 482, Syl. ¶ 1, 511 P.2d 705 (1973), the court declared that "[t]he adoption by the people of this state of the 1966 amendment to article 6 of the Kansas Constitution vested broad powers of supervision in the state board of education." The *Board of Education* court held that the portion of article 6, § 2 (a), which granted "the state board of education authority to exercise general supervision of the public schools, educational institutions and educational interests of the state . . . is self-executing in effect." 212 Kan. 482, Syl. ¶ 6. Also, "[w]here a constitutional provision is self-executing the legislature may enact legislation to facilitate or assist in its operation, but whatever legislation is adopted must be in harmony with and not in derogation of the provisions of the constitution." 212 Kan. 482, Syl. ¶ 7. Further,

"[t]he statutes of this state, as well as provisions of the constitution, contemplate that the state board of education shall have authority to supervise the public schools and to adopt regulations for that purpose, while local boards of education are to provide for the government and operation and maintenance of the public schools subject to such supervision." 212 Kan. 482, Syl. ¶ 8.

The 1966 amendments to Art. 6 of the Kansas Constitution vested broad powers of supervision in the State Board, and given the process the State Board used to decide whether to approve or disapprove USD 443's withdrawal from SKACD, it cannot be said

that the State Board has usurped its constitutional power in this case. The State Board first appointed a hearing panel delegated with the task of conducting an extensive hearing and making a recommendation to the State Board based on the evidence presented. The sufficiency of that evidence is not challenged on appeal.

In conclusion, USD 443 has not shown that the State Board usurped the power granted to it by the Kansas Constitution. The State Board does not have the authority to automatically reject a request to withdraw, but must conduct a hearing whereby opposing sides may present evidence on behalf of their case. Further, the State Board does not have unlimited power to decide the approval or disapproval; it must use the criteria set out by the legislature in the statute.

In summary, the Kansas Constitution grants local school boards the authority to take certain actions, but such power is limited and subject to the oversight of either the legislature and/or the State Board. USD 443 entered into the interlocal agreement with a provision in its contract that the agreement could be changed or terminated by the legislature. Likewise, even before the 1987 amendment was promulgated, K.S.A. 72-8230 provided that interlocal agreements were subject to change and termination by the legislature. Although the 1987 amendment operates retroactively, it passes the *Bott* test and, thus, is not unconstitutional due to the retroactive provision. Likewise, given the legislative history of the 1966 amendment to the Education Article of the Kansas Constitution, the legislature did not grant the State Board constitutionally prohibited power when it enacted the 1987 amendment to K.S.A. 72-8230.

Affirmed.