No. 53,555

MANHATTAN BUILDINGS, INC., *Petitioner,* v. PATRICK J. HURLEY, Secretary of Administration of The State of Kansas, *Respondent.*

(643 P.2d 87)

Opinion filed March 17, 1982.

*Benjamin J. Neill,* of Hamill, Lentz, Neill & Dwyer, of Mission, argued the cause, and *Thomas L. Thurston,* of the same firm, was with him on the petition for mandamus.

*Arthur H. Griggs,* chief attorney for the Department of Administration, argued the cause, and *Adele Ross Vine,* staff attorney for the Department of Administration, was with him on the brief for respondent.

*Dan Biles,* assistant attorney general, argued the cause for the intervenor attorney general, and *Robert T. Stephan,* attorney general, and *Bruce E. Miller,* deputy attorney general, were with him on the motion to intervene.

*Robert A. Coldsnow,* legislative counsel, argued the cause for intervenor Legislative Coordinating Council, and was on the motion to intervene.

The opinion of the court was delivered by

MILLER, J.: This is an original action in mandamus, brought by the petitioner, Manhattan Buildings, Inc., the owner of the Woman's Club building in downtown Topeka, against the respondent, Patrick J. Hurley, Secretary of Administration of the State of Kansas. Manhattan leased the building to the Secretary; before taking possession under the lease, the Secretary gave Manhattan a notice of termination. By this action, Manhattan asks this court to declare that the termination clause of the lease was not properly invoked, and that Section 69 of 1981 Senate Bill No. 470 (later 1981 Session Laws of Kansas, Chapter 32, Section 69,

and now K.S.A. 1981 Supp. 75-3921) is unconstitutional and void. Manhattan also seeks an order in the nature of mandamus, compelling the Secretary to perform all of his obligations under the lease. The attorney general and the Legislative Coordinating Council were granted leave to intervene.

The essential facts, which are not in substantial dispute, are as follows: Throughout the year 1980, various employees of the department of administration and the insurance department carried on negotiations with representatives from Manhattan Buildings with regard to leasing the Woman's Club building for the insurance department, which was to move from its quarters in the State Office Building to the Woman's Club building. These negotiations culminated in a written lease dated January 8, 1981, executed by Manhattan Buildings as lessor and the Secretary of Administration as lessee, and approved by the sublessee, Fletcher Bell, Commissioner of Insurance. The lease required the lessor to renovate the building according to stated and appended specifications, and to complete this work before the State took possession. The lease covered a period of ten years, commencing May 1, 1981. It provided for payment of rent in the total sum of $1,899,687.50, payable $17,969.78 on May 1, 1981, $94,984.38 to be paid semiannually on each July 1 and January 1 thereafter through July 1, 1990, and a final payment of $77,014.50 to be paid January 1, 1991. Clause No. 9 of the lease gives rise to this litigation. It reads as follows:

"*Termination for Fiscal Necessity:* Notwithstanding any other provision of this lease, if funds anticipated for the continued fulfillment of this lease agreement are at any time not forthcoming, either through the failure of the legislature to appropriate funds or the discontinuance or material alteration of the program under which funds were provided, then second party [the Secretary] shall have the right to terminate this lease by giving first party a reasonable notice specifying the reasons for such necessary termination."

It is undisputed that neither the insurance department nor the department of administration had available funds appropriated for the purpose of funding this specific lease during the fiscal year ending on the 30th day of June, 1981. Funding for the lease was to come from appropriations to be made by the 1981 legislature.

The insurance department, at the time the lease was entered into, was occupying space in the State Office Building. A request for funds to cover the rental for that space was included within the department's original budget request for the fiscal year be-

ginning on July 1, 1981. That request was not sufficient to cover the increased cost of leasing the Woman's Club building, and accordingly, early in 1981, that request was increased. The Governor, in his recommendations to the legislature, included the increased amount. Appropriations for the insurance department, incorporating that increase, were then included within 1981 Senate Bill No. 158. The bill was referred to the Senate Ways and Means Committee, where a subcommittee recommended that the increase be stricken from the insurance department's appropriation. The subcommittee's report explains its recommendation as follows:

"The Subcommittee concurs with the Governor's recommendations except for two items. The recommended $385,598 for rents exceeds the requested amount by $156,805 and reflects the anticipated relocation of the agency from the State Office Building to a privately-owned facility at 9th Street and Topeka Blvd. The Subcommittee questions whether it is in the best interests of the state to be contracting with a private landlord when the same funding could be dedicated toward amortizing the cost of a state-owned building. Furthermore, the Subcommittee is of the opinion that the Legislature should not appropriate additional funds for new leases prior to review of the comprehensive space management plan proposed by the Department of Administration."

The full Senate Ways and Means Committee, in considering the subcommittee report, discussed the possibility of planning a second state office building instead of leasing more space in privately owned buildings. It adopted the subcommittee report, and recommended the bill for passage. The Senate then passed the bill, with the additional funds deleted.

Next in the legislative process, a subcommittee of the House Ways and Means Committee recommended that the additional funds be restored to the insurance department's appropriation. The full committee, however, did not adopt the subcommittee report, and recommended the bill for passage without the additional funds requested by the insurance department. 1981 Senate Bill No. 158 was then passed by the House, approved by the Governor, and published, without an appropriation of funds for the insurance department to cover the Woman's Club lease.

That, however, is not the end of the legislative history. On April 30, 1981, upon the recommendation of the Governor, the House Ways and Means Committee adopted a motion to make a contingency appropriation of $550,000 to the department of administration for the cost of rent, moving expenses, and modification

costs of providing space for state agencies. Immediately thereafter, however, a substitute motion was adopted, which removed $150,000 from the contingency appropriation and placed it in the insurance department's budget. This was made a part of the omnibus appropriation bill, 1981 Senate Bill No. 470, and that bill, with the increased amount included within the insurance department's appropriation, was passed by the House on May 1, 1981. The bill was then referred to a conference committee, which prepared a report removing the $150,000 from the insurance department's appropriation, restoring a like amount to the contingency appropriation of the department of administration, and adding Section 69, which forbids the expenditure of moneys appropriated to any state agency for the lease of the Woman's Club property. The bill, amended as recommended by the conference committee, was adopted by both houses of the legislature on May 4, 1981. In that form it was approved by the Governor, was published, and is included within the 1981 Session Laws.

Section 5(a) of 1981 Senate Bill No. 470, now Section 5(a) of Chapter 32 of the 1981 Session Laws of Kansas, reads as follows:

"Sec. 5.

"DEPARTMENT OF ADMINISTRATION

"There is appropriated for the above agency from the state general fund for the fiscal year specified, the following:

| | Fiscal Year 1981 | Fiscal Year 1982 |
|---|---|---|
| "Contingency for supplemental rent, moving expenses, and modification costs of providing space for state agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $550,000 | |

"Provided, That any unencumbered balance in excess of $100 as of June 30, 1981, is hereby reappropriated for fiscal year 1982: *Provided, however,* That no expenditures shall be made from this account except upon approval of the state finance council acting on this matter which is hereby characterized as a matter of legislative delegation and subject to the guidelines prescribed in subsection (c) of K.S.A. 75-3711c: *Provided further,* That in considering expenditures from this account the department of administration shall give major consideration to relocating the division of information systems and computing of the department of administration outside the state office building."

Section 69 of 1981 Senate Bill No. 470, which became Section

69 of Chapter 32, 1981 Session Laws of Kansas, and is now K.S.A. 1981 Supp. 75-3921, reads as follows:

"No moneys appropriated to any state agency, as defined by K.S.A. 1980 Supp. 75-3701, and amendments thereto, shall be expended for *the lease* of the property located at 420 Southwest Ninth Street in the City of Topeka (commonly known as The Woman's Club) nor shall any other funds of any agency of state government be utilized for such purpose. *It is the intent of this section to invoke and exercise the 'termination for fiscal necessity' clause of the lease entered into by the department of administration for the property described in this section.*" (Emphasis supplied.)

On May 5, 1981, the day after Senate Bill No. 470 was enacted, and again on June 1, 1981, the date upon which the bill was published in the official state paper and became effective, the Secretary gave Manhattan Buildings written notice of termination, under Clause No. 9 of the lease. The June 1 notice reads in part:

"Senate Bill No. 470 was published today in the official state paper. That bill prohibits my department and all other state agencies from expending any funds for the lease of the Women's Club Building.

"Since the lease of the Women's Club contains a provision for terminating the lease in the event the legislature fails to appropriate funds for the continued fulfillment of the lease agreement, I am giving notice that the legislature has so failed to appropriate funds. For that reason, the lease is terminated effective today."

Subsequent negotiations between Manhattan and the Secretary proved fruitless. This action was then commenced.

Before turning to the specific issues raised, we should first consider some of the principles which govern the exercise of our jurisdiction in proceedings in the nature of mandamus. Article 3, Section 3 of the Kansas Constitution grants this court original jurisdiction in proceedings in mandamus. The exercise of that jurisdiction, however, is of necessity discretionary. Justice Rousseau Burch, speaking for the court in *In re Burnette,* 73 Kan. 609, 617, 85 Pac. 575 (1906), said:

"A few matters of great public importance and certain depredations upon personal liberty are cognizable in the first instance by the supreme court, through proceedings in *quo warranto,* mandamus, and *habeas corpus.* But even in such cases some special reason must exist for invoking its powers or parties will be relegated to a court of general jurisdiction for relief. [Citations omitted.]

"It would be entirely impossible for a single supreme court to hear and decide controversies generally, arising within the state, upon their merits; and if any considerable number of them were to be heard anew little opportunity would remain for the performance of the true functions of an appellate court."

K.S.A. 60-801 defines mandamus as "a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." It is, of course, an appropriate proceeding designed for the purpose of compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion. *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, Syl. ¶ 14, 436 P.2d 982 (1968).

Mandamus to compel the performance of a public duty will not ordinarily lie at the instance of a private person. Where, however, the individual shows an injury or interest specific and peculiar to himself, and not one that he shares with the community in general, then the remedy of mandamus and the other extraordinary remedies are available. *Nunn v. Morrison,* 227 Kan. 730, 732, 608 P.2d 1359 (1980), citing *Mobil Oil Corporation v. McHenry,* 200 Kan. at 243.

Mandamus is also a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that there also exists an adequate remedy at law. *Mobil Oil Corporation v. McHenry,* 200 Kan. at 239.

In the case at hand, if the duties of the Secretary were clear and nothing else were involved, complete relief could no doubt be secured in the district court, which has jurisdiction of mandamus actions, K.S.A. 60-801 *et seq.,* and where the matter may be heard by either a district judge or an associate district judge. K.S.A. 20-302, -302a. The case before us, however, is not so simple. It involves the interpretation of a clause in a lease, which we are informed is common to many leases of private property by the state, and a determination of the constitutionality and interpretation of acts of the legislature. The plaintiff lessor has an interest peculiar to it insofar as its particular lease is concerned, and yet a determination of the issues here will perhaps affect other leases and lessors, and give guidance in the administration of public affairs. Under the circumstances, we conclude that there are important public questions before us in this case, and in accordance with the authorities cited above, we shall exercise our

original jurisdiction in mandamus and proceed to determine those issues.

Was the termination clause of the lease properly invoked by the Secretary in terminating the lease with Manhattan Buildings? That clause provides in applicable part that "if funds anticipated for the continued fulfillment of this lease agreement are at any time not forthcoming . . . through the failure of the legislature to appropriate funds . . . then second party shall have the right to terminate this lease . . . ."

It is clear from the legislative history recited above that the anticipated funds to fulfill this lease were to come from budget appropriations for the insurance department. The insurance department asked for the funds, the Governor recommended them, both Senate and House committees discussed the funding of this lease, and both houses passed Senate Bill No. 158, with the necessary funds deleted. Finally, an attempt was made to include the necessary funds in an appropriation for the insurance department in the omnibus appropriation bill; this move failed and funds were never appropriated to the insurance department to fund this lease.

Manhattan contends that adequate funds were, however, appropriated by Section 5(a) of Senate Bill No. 470 where the sum of $550,000 was appropriated to the department of administration for supplemental rent, moving expenses, and modification costs of providing space for state agencies. A proviso to that act, however, states that no expenditures shall be made from the $550,000 appropriation except upon approval of the state finance council, which approval must be subject to the guidelines prescribed in subsection (c), K.S.A. 75-3711c. That subsection provides in substance that the approval of the state finance council shall be given only upon a finding that the requested action "is not one that was rejected in the next preceding session of the legislature and is not contrary to known legislative policy."

The legislature carefully and at length considered the Woman's Club lease; it refused to provide the requested funds; and it made clear by Section 69 that no moneys appropriated to any state agency (which includes the department of administration) shall be expended for the lease of the Woman's Club property. Under these facts, it is clear that the expenditure of appropriated funds, whether those appropriated by Section 5 of Senate Bill No. 470 or otherwise, is an action which was rejected by the 1981 Kansas

Legislature, and which is contrary to the expressed legislative policy. Accordingly, the state finance council could not approve the expenditure of Section 5 funds for the Woman's Club lease, and the Secretary could not spend the funds for that or any other purpose without finance council approval.

Anticipated funds for the fulfillment of the lease were not forthcoming, the legislature having failed to appropriate such funds. We hold that the occurrence anticipated by the termination clause occurred, and that the termination for fiscal necessity clause was properly invoked by the Secretary to terminate the lease.

Does Section 69 of 1981 Senate Bill No. 470, now K.S.A. 1981 Supp. 75-3921, constitute an unconstitutional impairment of the obligation of contracts in violation of Article I, Section 10, of the United States Constitution? We think not.

Article I, Section 10, provides that:

"No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

Manhattan contends that Section 69 violates this constitutional provision since it impairs the contract obligation created by the lease between Manhattan and the Secretary, and that the only real question is whether the impairment is of such a nature as to be impermissible. We do not agree.

We start an examination of this issue with the proposition that individuals are free to enter into such contracts as they may choose, subject only to limited and reasonable restraints. Freedom of contract is a qualified and not an absolute right, but it is one of those freedoms protected by the Fifth and Fourteenth Amendments to the Constitution of the United States. See *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 81 L.Ed. 703, 57 S.Ct. 578 (1937); 16A Am. Jur. 2d, Constitutional Law §§ 560, 592; and 16 C.J.S., Constitutional Law § 210. Freedom or liberty of contract also involves the right to agree upon such mutual terms as are not against public policy or prohibited by law, and such terms may, of course, provide for termination upon the occurrence of certain contingencies. As Justice Fromme, speaking for a unanimous court, said in *Augusta Medical Complex, Inc. v. Blue Cross,* 227 Kan. 469, 475, 608 P.2d 890 (1980):

"[C]ompetent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of

fraud, mistake or duress a party who has entered into such a contract is bound thereby. *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757, 549 P.2d 903 (1976). This would include any provision for mutual termination of the contract."

The parties to this action, in the exercise of their free right to contract, entered into the agreement which is the subject of this action. As before noted, it contained Clause No. 9, which authorized the Secretary to terminate the lease in the event that the funds anticipated for the continued fulfillment of the lease were not forthcoming, through the failure of the legislature to appropriate them. There is nothing illegal or contrary to public policy in the contract provision; fraud, mistake, or duress is not claimed. Clause No. 9, in effect, makes the contract contingent upon funding by the legislature. We see nothing wrong with such a provision. The legislature, by failing to fund the contract, and by the explicit language of Section 69, triggered the termination clause of the contract, and permitted one of the contracting parties to bring the contract to an end. This action was expressly within the contemplation of the contracting parties at the time the contract was made. We find no unconstitutional impairment of the obligation of contracts.

Manhattan Buildings next contends that Section 69 of 1981 Senate Bill No. 470 denies petitioner the equal protection and due process of law guaranteed it by the Fourteenth Amendment to the United States Constitution. It is petitioner's contention that Section 69 singles out the Woman's Club building and Manhattan Buildings as its owner, as a class of one, and prohibits any state agency from leasing the building at any time for any period, or from spending any state moneys for such purposes. We do not so read the provisions of the act.

Section 69 provides in effect that no appropriated moneys or other funds of any state agency shall be expended for *the lease* of the Woman's Club. The statute then provides:

"It is the intent of this section to invoke and exercise *the 'termination for fiscal necessity' clause of the lease* entered into by the department of administration for the property described in this section." (Emphasis supplied.)

The target of Section 69 is the ten-year lease dated January 8, 1981, executed by Manhattan Buildings and the Secretary, and then being considered by the 1981 legislature. No state funds may be spent for *that lease.* The section, however, does not prohibit the expenditure of appropriated or other public funds under or

pursuant to the terms of any other or later lease which may be entered into by some state agency in the future, for a different and perhaps shorter term, for the same building.

We turn now to the tests which must be applied in order to determine whether a legislative act denies due process or equal protection. Justice Owsley discussed both in *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221 (1978), when he said:

"[T]he test for due process . . . [is] whether the legislative means selected had a real and substantial relation to the objective sought. The rule has been restated in terms of whether the regulation is reasonable in relation to its subject and is adopted in the interest of the community. (*West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330.)

. . . .

"Our next concern is whether the statute offends the equal protection clause. When considering this question we must first determine the proper test. Traditionally, the yardstick for measuring equal protection arguments has been the 'reasonable basis' test. The standard was set forth in *McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L.Ed.2d 393, 81 S.Ct. 1101:

'. . . The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. . . .'

"In *Dandridge v. Williams,* 397 U.S. 471, 25 L.Ed.2d 491, 90 S.Ct. 1153, reh. denied 398 U.S. 914, 26 L.Ed.2d 80, 90 S.Ct. 1684, it was stated:

'. . . If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78. . . .' (p. 485.)

"A statute comes before the court cloaked in a presumption of constitutionality and it is the duty of the one attacking the statute to sustain the burden of proof. (*Henry v. Bauder,* 213 Kan. 751, 753, 518 P.2d 362; *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 760, 408 P.2d 877; *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78-79, 55 L.Ed. 369, 31 S.Ct. 337.)" 223 Kan. at 614, 616.

See also *Sheppard v. Sheppard,* 230 Kan. 146, 149, 630 P.2d 1121 (1981).

Under these standards, it would appear that the reasonable basis test is the yardstick under which the statute must be measured, as to both due process and equal protection. The legislative history, previously stated, makes it clear that the legislature was considering the entire problem of space for state agencies. It is undisputed that the Woman's Club lease was an attractive offer to

the State. At the same time, it involved a lengthy lease of privately owned space, presented for funding for the first time. The legislature, in seeking the most effective way to provide needed space for state agencies, concluded that leasing the Woman's Club building for a ten-year period was not desirable. The action was taken after consideration of the overall problem, and there is no indication that the action was arbitrary or other than in the utmost good faith. We conclude that Section 69 bears a real and substantial relation to the objective sought, and that there is a reasonable basis for the classification. We find no deprivation of due process or equal protection.

Manhattan Buildings next contends that Section 69 of 1981 Senate Bill No. 470 violates Article 2, Section 16, of the Kansas Constitution, which reads in part:

"No bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes."

Manhattan contends that the subject matter of Section 69 is foreign to the subject of appropriations. We disagree. It specifically and clearly states that no funds shall be expended for a particular purpose. In the recent case of *State ex rel. Stephan v. Carlin,* 230 Kan. 252, 258, 631 P.2d 668 (1981), where another section of the same act was challenged as violative of the same constitutional section, we said:

"Appropriation bills may direct the amounts of money which may be spent, and for what purposes; *they may express the legislature's direction as to expenditures;* they may transfer funds from one account to another; they may direct that prior unexpended appropriations lapse." (Emphasis added.)

By Section 69 the legislature was clearly expressing its direction as to expenditures, stating that appropriated moneys and other public funds could not be spent for a certain purpose. It falls squarely within the language of *Stephan v. Carlin,* emphasized above. We find no violation of Article 2, Section 16.

Finally, Manhattan contends that Section 69 of 1981 Senate Bill No. 470 constitutes a usurpation of the powers of the executive department by the legislative department, and thus violates the separation of powers doctrine. The separation of powers doctrine has been discussed and explained at length in several recent and illuminating unanimous opinions of this court, and we do not need to expound at length on the subject here. See *State v. Greenlee,* 228 Kan. 712, 620 P.2d 1132 (1980); *State, ex rel., v.*

*Bennett,* 219 Kan. 285, 547 P.2d 786 (1976); *Leek v. Theis,* 217 Kan. 784, 539 P.2d 304 (1975); and *Van Sickle v. Shanahan,* 212 Kan. 426, 511 P.2d 223 (1973).

Statutes are, of course, presumed to be constitutional; all doubts must be resolved in favor of validity, and before a statute may be stricken down, it must clearly appear that the statute violates the constitution. When a statute is challenged as violating the constitutional doctrine of separation of powers, the court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented. The cited cases conclude that absolute separation of powers is impossible, and that a slight degree of blending or admixture of the three powers of government is unavoidable. To constitute a usurpation of powers, one department of the government must be subjected, directly or indirectly, to the coercive influence of the other; there must be a significant interference by one department with the operations of another.

In considering whether a usurpation of powers exists, a court should consider various factors. In *State, ex rel., v. Bennett,* 219 Kan. at 290, 291, these are said to include:

(a) The essential nature of the power being exercised;

(b) The degree of control by the legislative department in the exercise of the power;

(c) The nature of the objective sought to be attained by the legislature;

(d) The practical result of the blending of powers as shown by actual experience over a period of time.

The assignment of office space for executive agencies in both state-owned and leased buildings is traditionally a function of the executive branch, and the actual leasing of space is also an executive function. The legislature, however, appropriates the funds which are expended by all branches of government, and it is concerned with the overall picture and cost of housing state government. New buildings cannot be acquired by construction or purchase without specific legislative authorization through the appropriation process. As we have seen, the 1981 legislature was concerned with the new ten-year lease at hand, since it was considering the construction or purchase of a new facility. The legislature appropriated funds for the leasing of various build-

ings, including one or more properties owned by Manhattan, but stopped short when it came to the funding of this new long-term lease of the Woman's Club building. It thus limited the executive branch in one specific and isolated area, and for various stated reasons. No similar legislation during the past several years has been called to our attention, and we know of no attempt by the legislature to regularly limit or direct the executive branch in this specific area.

Upon careful consideration of all of the facts before us, we conclude that Section 69 of 1981 Senate Bill No. 470 is not a significant interference by the legislative branch with the executive branch, and that Section 69 does not constitute a usurpation of powers. We find the legislation constitutional.

Relief in the nature of mandamus is denied.

HERD, J., dissenting: My examination of the State's contract with Manhattan Builders and of Senate Bill No. 470 leads me to differ with the majority.

There is no question the secretary of administration, representing the executive branch of state government, had authority to bind the State of Kansas to the lease contract. The sole question presented in this appeal is whether the termination clause of the lease was triggered. It provided the lease was terminable on notice "if funds anticipated . . . are at any time not forthcoming . . . through failure of the legislature to appropriate funds . . . ." Here the legislature appropriated the funds for rent but placed the funds in the department of administration's budget rather than the insurance department's budget. That is not a failure to appropriate. Both departments are in the executive branch. The director of administration is authorized to pay rent. The budget change is a distinction without a difference. Such maneuvering should not terminate a contractual obligation of the State.

It is argued the legislative restriction on the expenditure of the appropriated rental funds operates to nullify the appropriation as it pertains to this lease. This presents a separation of powers question: May the legislature restrict the executive in its administration of a law by placing restraints on the use of appropriated funds? Let us examine the authorities. 16 Am. Jur. 2d, Constitutional Law § 294, pp. 804-05, states:

"[T]he doctrine is generally accepted that none of the several departments is subordinate, but that all are co-ordinate, independent, coequal, and potentially coextensive.

"It has been said that if government is to function constitutionally, it is necessary for each of the repositories of constitutional power to keep within its power.

"The true meaning of the general doctrine of the separation of powers seems to be that the whole power of one department should not be exercised by the same hands which possess the whole power of either of the other departments, and that no one department ought to possess directly or indirectly an overruling influence over the others.

"The rule is generally recognized that constitutional restraints are overstepped where one department of government attempts to exercise powers exclusively delegated to another; officers of any branch of the government may not usurp or exercise the powers of either of the others, and, as a general rule, one branch of government cannot permit its powers to be exercised by another branch."

This court has recognized the separation of powers doctrine is applicable to Kansas governmental organization. In *Van Sickle v. Shanahan,* 212 Kan. 426, 447, 511 P.2d 223 (1973), we stated:

"The concept of a republican form of government and by implication the doctrine of separation of powers were the underlying assumption upon which the framework of the new government was developed. In reaching this conclusion, this court holds that the doctrine of separation of powers is an inherent and integral element of the republican form of government, and separation of powers, as an element of the republican form of government, is expressly guaranteed to the states by Article IV, Section 4 of the Constitution of the United States."

*Van Sickle v. Shanahan* also noted the different functions of the three branches of government:

"Generally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws in actual controversies." 212 Kan. at 440.

In *State, ex rel., v. Bennett,* 219 Kan. 285, Syl. ¶¶ 4, 5, 547 P.2d 786 (1976), this court laid out the standard for determining usurpation of power by one branch of another:

"A usurpation of powers exists where there is a significant interference by one department with operations of another department." 219 Kan. at Syl. ¶ 4.

"In determining whether or not a usurpation of powers exists a court should consider (1) the essential nature of the power being exercised; (2) the degree of control by one department over another; (3) the objective sought to be attained by the legislature; and (4) the practical result of the blending of powers as shown by actual experience over a period of time." 219 Kan. at Syl. ¶ 5.

Let us weigh this legislative action against the foregoing stan-

dard. (1) The essential nature of the power being exercised is one of prohibiting the executive branch from using discretion in administering an appropriation for rent of executive branch office space. This constitutes an invasion of executive prerogative. (2) The degree of control by the legislature over the executive by this technique is considerable. If such a restriction on expenditure of appropriations is constitutionally permissible, there need be only one branch of government. After the legislature chose its favorite vendors and lessors the mechanical task of writing checks would be all that remained. (3) The objective sought by the legislature is obviously control of from whom space is leased. Respondents argue the legislature was merely delaying action until it determined whether to lease space or build it. This claim has no credibility. If the claim were true, the rent funds would not have been appropriated and the termination clause of the lease would, without question, have been effective. Here the amount of rent budgeted was funded but with the ban on payment to Manhattan Builders. This is an obvious usurpation of executive powers. (4) The practical result of such practice is a takeover of the duties of the executive branch by the legislature. If such practice is constitutional, there is nothing to prevent the legislative branch, by the same technique, from forcing the judicial branch to exercise its function according to legislative dictates. As James Madison stated in The Federalist, No. 47 at 313:

"No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that on which the objection is founded. The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."

The legislative function is to set public policy. The executive function is to administer that public policy. Choosing between vendors and lessors is an executive function. The legislative function is to determine "how much," not "to whom."

Justice Fatzer's dissent in *State, ex rel., v. Fadely,* 180 Kan. 652, 672, 308 P.2d 537 (1957), emphasized the importance of this issue:

"The separation of powers of government represents probably the most important principle declaring and guaranteeing the liberties of the people. It is one of the chief merits of the American system of written constitutions, and, in a broad sense, the safety of our institutions depends in no small degree on the strict

observance of the independence of the three departments. [Citations omitted.] The separation of these powers; the independence of one from the other; and, the requirements that one department shall not exercise or usurp the powers of the other two, is fundamental. Each acts, and is intended to act, as a check upon the other, and thus, a balance system is maintained. No theory of government has been more loudly acclaimed."

I would grant mandamus.

FROMME and HOLMES, JJ., join the foregoing dissent.