2002 UT 90

**Robert LOW, Joel Palmer, Julia Redd, and Albert Steele, Plaintiffs and Appellants,**

v.

**CITY OF MONTICELLO, K. Dale Black, Douglas Allen, Julie Bronson, Kim Burtenshaw, Clyde Christensen, Evan Lowry, and C. Trent Schaffer, Defendants and Appellees.**

No. 20010191.

Supreme Court of Utah.

Aug. 30, 2002.

R. Brent Stephens, Heather S. White, Salt Lake City, for plaintiffs.

Randy T. Austin, Alexander Dushku, Matthew K. Richards, Salt Lake City, for defendants.

RUSSON, Justice:

¶ 1 Robert Low, Joel Palmer, Julia Redd, and Albert Steele appeal from the trial court's order granting in part the motion for summary judgment filed by the City of Monticello (individually, "the city"), certain members of the city council, and certain city government officials (collectively, "Monticello City") and from the trial court's concomitant denial of Low's cross-motion for summary judgment. We affirm in part, reverse in part, and remand.

## BACKGROUND

¶ 2 In an April 24, 1979, special election, voters residing in the city authorized the city to sell its electrical power distribution system (the "system"). Thereafter, the Monticello city council enacted an ordinance on November 7, 1979, that sold the system to Empire Electric Association, Inc. ("Empire"), a private entity, and granted Empire the exclusive right to maintain and operate an electric distribution franchise. In the same ordinance, however, the city retained an option to repurchase the system, which provided:

> This franchise shall be granted for a 20 year term from the date it is passed by the City Council and shall be automatically renewable at the end of said term for an additional 20 year term, unless the City exercises its right to repurchase the electrical system in accordance with the terms set forth in that certain agreement between the parties dated August 8 and September 9, 1979.

Empire and the city further agreed that if the city chose to exercise the repurchase option, the system repurchase price would be the system's fair market value at the time of repurchase.

¶ 3 Eighteen years later, on September 8, 1997, the city council passed resolution 1997–6 in which it resolved "that the City of Monticello shall pursue its option to repurchase the municipal electrical system" and to undertake a feasibility study regarding the possible repurchase. Thereafter, the city began discussing the fair market value with Empire.

¶ 4 In 1998, the city and Empire agreed to jointly retain a qualified firm to appraise the system, its real and personal property, customer base, capital investments, and other features influencing the fair market value. After the appraiser issued its report, the parties agreed that the fair market value of the system was $1,315,271.

¶ 5 After determining this base value, the city conducted a feasibility analysis to estimate the yearly costs and revenues associated with the system. The purpose of the feasibility analysis was to provide information to the city so that it could determine the benefits of repurchasing the system. According to the analysis, the city concluded that it could expect annual net revenues averaging between $200,000 and $300,000 through the year 2019 or, alternatively, that the city could reduce electric rates.

¶ 6 As the process continued, the city residents raised objections to the proposed repurchase. In particular, some of the objecting residents urged the city council to submit the decision of whether to repurchase the system to a public vote. The city council refused, explaining to the objecting residents that the decision of how the city fulfills its duty to supply utility services to its residents is an administrative decision not subject to referendum. On March 22, 2000, a petition for a referendum election on the issue, which was signed by 270 of the city residents, was presented to the city council. Nevertheless, that same day the city council again refused to hold a referendum and instead voted to adopt resolution 2000–2, which formally exercised the city's option.

¶ 7 On April 6, 2000, the city council adopted resolution 2000–3, which authorized the future issuance of bonds to finance the repurchase. Resolution 2000–3 specified that the aggregate principal amount of the bonds would be "not more than $3,000,000" and the maximum interest rate would be 6.75 percent per annum for a period of not more than twenty-six years. On April 12, 2000, the city notified the public of its intention to issue revenue bonds to finance the repurchase by publishing a notice of bonds to be issued in *The San Juan Record*, which is designated as the city's official newspaper. Consistent with resolution 2000–3, the notice stated that the principal amount would be just under three million dollars and the maximum interest rate would be 6.75 percent.

¶ 8 Then, on April 14, 2000, the San Juan County Clerk received eleven official packets petitioning city officials for a referendum on whether the city should purchase the system pursuant to resolution 2000–2. The clerk verified the signatures and certified that 355 of the 367 signatures were those of registered voters and that 349 of the signatures were those of registered voters who lived in the city. The city recorder concluded that the city had received sufficient signatures under Utah Code section 20A–7–601 to impel a referendum. Accordingly, the city attorney prepared a ballot title for the proposed referendum. Subsequently, however, on June 29, 2000, the city recorder withdrew the vote from the public, and the city informed the residents of the withdrawal, stating, "The decision to repurchase the utility is a purely administrative decision that is not the proper subject of a referendum within the meaning of Section 1, Article VI, of the Utah Constitution" and that a successful referendum would violate the contracts clauses of the United States and Utah Constitutions. Dissatisfied, certain city residents threatened a lawsuit.

¶ 9 During the pendency of the bond issue but before the city notified the residents that the referendum petition would be denied, the city attempted to attain interim sources of funding. At one point, the city negotiated an agreement with Zion's Bank in an attempt to finance the repurchase of the system on a short-term line of credit. On May 10, 2000, the city council approved entering into such a loan agreement.

¶ 10 Ultimately, Robert Low, Joel Palmer, Julia Redd, and Albert Steele (collectively, "Low") filed a verified complaint on May 12, 2000, initiating this lawsuit. In the verified complaint, Low alleged that (1) Monticello City contravened the Utah Municipal Bond and Notice of Debt Issuance Acts and (2) Monticello City violated the Open and Public Meetings Act. To redress these alleged statutory violations, Low prayed for injunctive relief to enjoin the repurchase of the system and declaratory relief that any final action taken to consummate the repurchase or to incur debt in connection therewith was void. The instigation of legal action led to the termination of the loan negotiations with Zion's Bank, and to date the city has not issued any bonds or otherwise incurred any debt to finance the repurchase. On July 12, 2000, the city filed an amended answer that

included a counterclaim seeking a declaration that the city's exercise of the option was not the proper subject of a referendum.

¶ 11 Monticello City moved for summary judgment on all claims asserted in both the verified complaint and its counterclaim. Low filed a cross-motion for partial summary judgment. On January 16, 2001, the trial court granted Monticello City's motion with respect to Low's claim alleging violation of the Utah Municipal Bond and Notice of Debt Issuance Acts and with respect to Monticello City's counterclaim on the referendum issue. Further, the trial court certified this summary judgment order as a final order pursuant to rule 54 of the Utah Rules of Civil Procedure. The trial court reserved judgment on the Open and Public Meetings Act claim at that time, but ultimately resolved the claim in a sealed memorandum decision and a subsequent order on the memorandum decision.

¶ 12 Low appealed the trial court's order granting summary judgment to Monticello City. Low first argues that the trial court erred in granting summary judgment to Monticello City on the referendum issue because the trial court incorrectly concluded that the city's decision to purchase the system was administrative instead of legislative and the trial court erred in concluding that submitting resolution 2000–2 to the voters via a referendum would violate the contracts clauses of the United States and Utah Constitutions. In response, Monticello City contends that the city did not make a new law when it exercised the option to repurchase the system, but instead availed itself of an opportunity that previous legislative acts reserved. Monticello City also argues that holding a referendum after the city had already contracted to repurchase the system would contravene the contracts clauses of the United States and Utah Constitutions.

¶ 13 Further, Low contends on appeal that the trial court erred in concluding that Monticello City did not contravene the Utah Municipal Bond Act (the "Act") and that the trial court erred in concluding that the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38 (1997 & Supp.2001), the ripeness doctrine, and the standing doc-

trine preclude Low's claim that Monticello City violated the Act. Monticello City counters that the city did not violate the Act because (1) the city was not required to publish notice under the Act, (2) the terms stated in the notice do not control the terms of the bonds ultimately issued, (3) the notice fully complies with Utah law and reflects the good faith parameters set by the city, and (4) the ripeness and standing doctrines preclude Low's claim that Monticello City violated the Act. Neither Low nor Monticello City has appealed the trial court's memorandum decision or the attendant order regarding Monticello City's alleged violation of the Open and Public Meetings Act, and therefore that issue is not before us on appeal.

## STANDARD OF REVIEW

¶ 14 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c); *see also Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 14, 52 P.3d 1179. "Whether the trial court properly granted summary judgment is a question of law that we review for correctness, according no deference to the trial court's legal conclusions." *Bakowski*, 2002 UT 62 at ¶ 14, 52 P.3d 1179. Additionally, when reviewing a grant of summary judgment, " 'we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *Ault v. Holden*, 2002 UT 33, ¶ 15, 44 P.3d 781 (quoting *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 2001 UT 91, ¶ 6, 34 P.3d 785).

## ANALYSIS

### I. REFERENDUM

¶ 15 The first issue in this case is whether the city council's exercise of the option to repurchase the system is subject to a referendum. The trial court, in granting summary judgment to Monticello City, concluded that the city council's enactment of resolution 2000–2 was not subject to referendum because the enactment was an administrative, rather than a legislative, act and because "it would violate the contracts clause[s] of the

Utah and United States Constitutions to allow a referendum that would have the possible effect of interfering with the 'contract' created between the City and Empire Electric by the passage of Resolution 2000–2." Low asserts that the trial court erred in both conclusions.

### A. Failure to Appeal to Supreme Court within Ten Days

■ ¶ 16 Initially, Monticello City argues that Utah Code section 20A–7–607(4)(a) bars any challenge to the city's refusal to hold a referendum because Low did not apply to the Utah Supreme Court to obtain an extraordinary writ to compel a referendum within ten days after the city clerk informed the city residents petitioning the city for a referendum that such referendum would not be held. Section 20A–7–607(4)(a) provides:

> If the local clerk refuses to accept and file any referendum petition, any voter *may* apply to the Supreme Court for an extraordinary writ to compel him [or her] to do so within ten days after the refusal.

Utah Code Ann. § 20A–7–607(4)(a) (1998) (emphasis added); *cf. id.* §§ 20A–7–608(4), –610(4). The plain language of the statute specifically states that any voter *may* apply to this court for an extraordinary writ, and if the voter does so, the voter must apply within ten days. *See id.* § 20A–7–607(4)(a); *see also Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 25, 48 P.3d 895 (noting that use of word "may" indicates that individual is permitted to act in particular manner). The statute does not limit either the remedies that can be sought or the court in which those remedies can be pursued, but rather provides for a particular remedy and the limitations to which that remedy is subject.

¶ 17 Moreover, the referendum issue in this case was presented to the trial court within the ten-day limitation period set forth in the statute, although brought by Monticello City in its counterclaim.[1] Rule 6(a) of the Utah Rules of Civil Procedure provides:

> In computing any period of time prescribed or allowed ... by any applicable

statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included.... When the period of time prescribed or allowed ... is less than 11 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

Utah R. Civ. P. 6(a). In addition, rule 6(e) provides:

> Whenever a party has the right or is required to do some act ... within a prescribed period after the service of a notice or other paper upon him and the notice or paper is served upon him by mail, 3 days shall be added to the end of the prescribed period as calculated in subsection (a). Saturdays, Sundays and legal holidays shall be included in the computation of any 3-day period under this subsection....

Utah R. Civ. P. 6(e).

¶ 18 In a letter dated June 29, 2000, the city notified the sponsors of the referendum petition by mail that the petition would be denied. Assuming that the denial letter was mailed on Thursday, June 29, 2000, the ten-day statutory limitation period would have expired on Friday, July 14, 2000, after five days are excluded from the computation according to rule 6(a): July 4 should be excluded as a legal holiday, and July 1, 2, 8, and 9 should be excluded as Saturdays and Sundays. Once three days are added under rule 6(e) to the end of the prescribed period as computed, any challenge could have been filed until and including July 17, 2000. Monticello City raised the referendum issue in its answer and counterclaim that was filed on July 12, 2000, before the expiration of the limitation period. Therefore, section 20A–7–607(4)(a) does not time-bar any challenge to the city's refusal to hold a referendum.

### B. Contracts Clauses

■ ¶ 19 Next we must address Monticello City's contracts clause contentions, which if dispositive would be a sufficient ground upon which to affirm the trial court's summary judgment order on the referendum issue,

---

1. When Low filed the verified complaint on May 12, 2000, the city had not yet denied its petition for a referendum, and Low stated in the verified complaint that a petition for a referendum election was pending before the city.

thus obviating the need to determine if resolution 2000–2 is subject to referendum. Monticello City contends that a referendum should not be held because a "referendum voiding Resolution 2000–2 would vitiate the currently binding contract between the City and Empire Electric" in violation of the contracts clauses of the United States and Utah Constitutions. The Contracts Clause of the United States Constitution provides: "No state shall ... pass any ... law impairing the obligations of contracts...." U.S. Const. art. I, § 10, cl. 1. Similarly, the contracts clause of the Utah Constitution provides: "No ... law impairing the obligation of contracts shall be passed." Utah Const. art. I, § 18. The contracts clauses' prohibitions of the passage of laws that impair the obligations of contracts extend to any form of legislative action, including referenda and other direct action by the people. *See Ross v. Oregon,* 227 U.S. 150, 163, 33 S.Ct. 220, 57 L.Ed. 458 (1913); *Fuller–Toponce Truck Co. v. Pub. Serv. Comm'n,* 99 Utah 28, 36–37, 96 P.2d 722, 726 (1939). Essentially, Monticello City contends that if a referendum is passed that abrogates resolution 2000–2, the voters would be passing a law impairing the city's obligation to repurchase the system under the city's contract with Empire.

▪ ¶ 20 However, we need not decide this question. A contract's obligation cannot be constitutionally impaired by the passage of a law if the contract itself relieves the parties of the obligations to perform, even if the duty to perform is rescinded by a clause in the contract that contemplates legislative action that would otherwise impair the obligations of contract. *Nat'l Bldg. v. State Bd. of Educ.,* 85 N.M. 186, 510 P.2d 510, 512 (1973); *see also Manhattan Bldgs., Inc. v. Hurley,* 231 Kan. 20, 643 P.2d 87, 95 (1982). Indeed, contract obligations are not impaired if the contract itself relieves the parties of their obligations as a result of a provision of the contract that conditions the obligations to perform on the government's not passing a particular law. *See Harper v. Great Salt Lake Council, Inc.,* 1999 UT 34, ¶ 14, 976 P.2d 1213 (stating that "[f]ailure of a material condition precedent relieves the obligor of any duty to perform").

▪ ¶ 21 In the instant case, the city and Empire specifically agreed:

If a REFERENDUM election relating to the purchase of the SYSTEM is held ... and

(i) the result of the election is that MONTICELLO Resolution 2000–2 is upheld, then the closing shall be scheduled for 60 days from the date of the election; or

(ii) the result of the election is that MONTICELLO Resolution 2000–2 is rescinded, and/or the citizens vote that the City shall not purchase the SYSTEM, then EMPIRE's franchise under Ordinance 79–11 shall be extended for 20 years pursuant to Ordinance 79–11.

According to the plain language of the parties' agreements, the repurchase of the system was expressly conditioned upon resolution 2000–2 being upheld in a referendum election if a referendum is held. In other words, the parties agreed in the contract itself that the continued contractual obligations regarding the purchase of the system would continue only if resolution 2000–2 is upheld by a referendum if a referendum were to be held and the parties would be relieved of their reciprocal respective duties to sell and purchase the system if the resolution were to be rescinded by referendum. Because the contract unequivocally conditioned the sale on resolution 2000–2 being upheld in a referendum if held, the contract obligations in this case cannot be impaired because the contract itself relieves the parties of the duties to perform if resolution 2000–2 is not upheld in a referendum. The very event that Monticello City claims would impair the obligations under the contract and would repudiate the parties' duties to perform is the same event which triggers the condition in the contract and upon which the continued duties to perform are conditioned if a referendum is ever held. *See Nat'l Bldg.,* 510 P.2d at 512.

¶ 22 It is therefore impossible to contend that if a referendum repudiates resolution 2000–2, then the referendum would violate the contracts clauses of the United States and Utah Constitutions. Further, it is of no moment that this provision was in an agree-

ment to extend the closing and not in the original contract because any agreement can be amended, modified, or altered by subsequent agreement of the parties, as is the case here. *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 90 (Utah 1988); *Rapp v. Mountain States Tel. & Tel. Co.*, 606 P.2d 1189, 1191–92 (Utah 1980). Therefore, a referendum election abrogating resolution 2000–2, if required in this case, *see infra* part I.C., does not contravene the contracts clauses of the United States and Utah Constitutions, and the trial court erred in concluding that the city properly refused to hold the referendum for this reason.

### C. Option to Repurchase Not Subject to Referendum

¶ 23 Next it must be decided whether the city council's exercise of the option to repurchase the system is subject to a referendum. Article VI of the Utah Constitution vests the sovereign legislative power of the state in two separate bodies: (1) the state's legislatures, including city councils, and (2) the people of the state, which is exercised by initiative and referenda. Utah Const. art. VI, § 1; *see also Gallivan v. Walker,* 2002 UT 89, ¶ 23, 54 P.3d 1069. Section 1 of article VI provides in pertinent part:

> The legal voters or such fractional part thereof as may be provided by law, of any legal subdivision of the State, under such conditions and in such manner and within such time as may be provided by law, . . . may require *any law or ordinance passed by the law making body* of said legal subdivision to be submitted to the voters thereof before such law shall take effect.

Utah Const. art. VI, § 1(2)[2] (emphasis added); *see also* Utah Code Ann. § 20A–7–102(3) (1998); *Wilson v. Manning,* 657 P.2d 251, 252 (Utah 1982). If a petition for a referendum concerning an appropriate subject is properly made to public officials, then the public officials must set the issue for public vote. *See* Utah Code Ann. §§ 20A–7–

607 to –608; *see also Keigley v. Bench,* 97 Utah 69, 72–73, 84, 89 P.2d 480, 481–82, 486 (1939) (*"Keigley II "*). However, public officials of a municipality can reject a referendum petition that is directed to a matter that is not subject to referendum. *Salt Lake on Track v. Salt Lake City,* 939 P.2d 680, 682 (Utah 1997).

¶ 24 Under article VI, only "law[s] and ordinance[s]" enacted by "the law making body," or in other words, legislative enactments, of a municipality are to be referred to the municipality's voters, Utah Const. art. VI, § 1(2); *see also* Utah Code Ann. § 20A–7–102(3); *Bigler v. Vernon,* 858 P.2d 1390, 1391 (Utah 1993), and public officials can reject a referendum petition regarding non-legislative municipal action, *see Salt Lake on Track,* 939 P.2d at 682. Thus, the city council's exercise of the option to repurchase the system is amenable to referendum only if it is legislative in nature and not administrative in nature. *Keigley II,* 97 Utah at 76, 89 P.2d at 483; *see also Wilson,* 657 P.2d at 252; *Bird v. Sorenson,* 16 Utah 2d 1, 2, 394 P.2d 808, 808 (1964); *Shriver v. Bench,* 6 Utah 2d 329, 330–31, 313 P.2d 475, 476 (1957). The formal label of a city council's action is not determinative; courts must look to the substance of the city council's action to determine if it is legislative or administrative. *See Keigley v. Bench,* 90 Utah 569, 573–74, 63 P.2d 262, 265 (1936) (*"Keigley I "*). In general, to be legislative, an ordinance must make a new law; to be administrative, an ordinance must execute or implement an existing law. *Keigley II,* 97 Utah at 77–78, 89 P.2d at 484; *see also Citizen's Awareness Now v. Marakis,* 873 P.2d 1117, 1122 (Utah 1994) ("The original enactment of a zoning ordinance is usually legislative and subject to referendum, while the implementation of that ordinance is typically administrative and inappropriate for referendum."). When legislative action is passed, it often authorizes public officials, including city councils, to exercise administrative powers and make administrative decisions. *See Citizen's Aware-*

---

**2.** This provision of the Utah Constitution has been amended and is found at Utah Constitution article VI, section 1(2)(b)(ii) (Supp.2001) (effective January 1, 2001). We apply the constitution as it existed at the time of the events giving rise to this suit, and we therefore apply the previous version. *Taghipour v. Jerez,* 2002 UT 74, n. 1, 52 P.3d 1252.

*ness Now,* 873 P.2d at 1122 (stating that implementation of ordinance enacted legislatively is administrative). To determine whether the city's decision to exercise the option to repurchase the system from Empire is subject to referendum, it must first be resolved whether the decision to purchase a power system in general is legislative in nature, and if it is, it must next be decided whether the exercise of the option to repurchase is subject to a referendum.

■ ¶ 25 Both parties assert various tests for determining whether particular action by a city council constitutes legislative or administrative action. However, application of the various competing tests is unnecessary in this case, because we have previously decided that the decision to purchase or acquire a power system, such as the system at issue here, is a purely legislative decision, which is subject to submission upon petition to the voters. We previously explained that

> *in the matter of acquiring* or constructing *a power plant, the legislative or lawmaking function would go at least to the extent of a decision to (1) acquire or construct,* (2) the size of the plant as regards [sic] capacity, (3) the type of plant, [and] (4) the maximum cost of the plant. Perhaps all other matters may be executive or administrative, such as the make of generators, the material of which the plant is to be constructed, whether brick, stone, or concrete, and the other multitude of minutiae attendant on the building of such a plant.

*Utah Power & Light,* 94 Utah 203, 224, 74 P.2d 1191, 1200 (1937) (emphasis added); *see also Keigley I,* 90 Utah at 574–75, 63 P.2d at 265 (stating that resolution regarding issuing revenue bonds was legislative action subject to referendum because it was "calculated to bind Provo City to contract for or purchase an electric lighting and power system and to operate the same until the revenue bonds were paid" (dictum)). Consequently, the original ordinance or enactment codifying the city council's decision to purchase a power system is subject to referral upon petition to the voters. *Cf. Citizen's Awareness Now,* 873 P.2d at 1122 ("The original enactment of a zoning ordinance is usually legislative and

subject to referendum...."); *Wilson,* 657 P.2d at 253 (same).

¶ 26 The question remains whether the resolutions exercising the option to repurchase the system in this case are legislative actions to purchase a power system or whether they are the administrative implementation of the original 1979 reservation of the option to repurchase the system. On April 24, 1979, city residents voted to sell the system, which was owned by the city at that time. It is unclear from the record before us whether the special election included the option to repurchase the system.

■ ¶ 27 Then on November 7, 1979, the city council enacted an ordinance that sold the system to Empire and simultaneously retained for the city the option to repurchase. In this ordinance, the city council concurrently performed two distinct legislative functions: (1) selling the system, and (2) retaining the option to repurchase. The portion of the ordinance retaining the option to repurchase provided:

> This franchise shall be granted for a 20–year term from the date it is passed by the City Council and shall be automatically renewable at the end of said term for an additional 20–year term, *unless the City exercises its right to repurchase the electrical system* in accordance with the terms set forth in that certain agreement between the parties dated August 8 and September 9, 1979.

(Emphasis added.) Retaining the option is tantamount to making the decision to purchase the system. When the decision to purchase is made, the city council enacts a law authorizing city officials to take the administrative action necessary to realize the purchase, such as to contract with the seller or to conduct feasibility analyses. Similarly, in this case, the city council made the policy-based legislative decision to retain for itself the option to repurchase, which authorized the city officials to take the same administrative action that they would take to effectuate the purchase of the system, e.g., contract with the seller or conduct feasibility analyses. In other words, by codifying the option in the ordinance, the city council legislated the ability to repurchase the system and reserved

for itself the administrative power to accomplish the repurchase of the system, thus retaining ultimate control over the system and its ownership. The city council made the legislative decision at that time to reserve the power to repurchase the system at its sole discretion, albeit twenty years in the future.

¶ 28 As a legislative enactment, the retention of the option to repurchase was amenable to a referendum election. *See* Utah Code Ann. § 20–11–21 (1976); *Bird,* 16 Utah 2d at 2, 394 P.2d at 808; *Keigley II,* 97 Utah at 76, 89 P.2d at 483. Nevertheless, the city residents neither challenged the retention of the option nor sought a referendum on that decision, and because the residents did not challenge that ordinance within thirty days [3] after the city council passed the ordinance, a referendum on this issue would now be untimely. Utah Code Ann. § 20–11–24 (1976); [4] *see also Bigler,* 858 P.2d at 1392; *Riverton Citizens for Constitutional Gov't v. Beckstead,* 631 P.2d 885, 886–88 (Utah 1981).

▆▆▆ ¶ 29 However, even though city residents never submitted a timely referendum petition to challenge the option to repurchase, it is unclear from the record whether the city residents were adequately notified of the option's retention when it was codified by ordinance in 1979. City councils must give city residents adequate notice of legislative enactments so that the residents can be cognizant of legislative enactments that they may want to challenge by a referendum and so that the residents initiate referendum procedures promptly. *See Citizen's Awareness Now,* 873 P.2d at 1123. To have a meaningful opportunity to exercise their constitutional right to a referendum on whether the city should have retained the option, the city must have afforded the voters adequate notice regarding the option when it was codified.

▆▆▆ ¶ 30 Ostensibly, the city prepared an official notice of sale of the system on July 3, 1979, signed by the city's mayor, that explained the city intended to reserve a right to repurchase the system. It is unclear from the record, however, whether this notice of sale was ever recorded or otherwise made public such that it would provide actual notice of the reservation of the option.

¶ 31 We therefore remand to the trial court. On remand, it must first be determined whether the special election held on April 24, 1979, incorporated the option to repurchase the system. If it did, then the residents have already exercised their right to a referendum regarding the option to repurchase, and therefore resolutions 1997–6 and 2000–2 were administrative exercises of that option as a matter of law. If the residents did not have the opportunity to vote on the retention of the option, however, then it must be resolved whether the city provided adequate notice to the residents concerning the retention of the option such that the residents had an opportunity to initiate a referendum. If it is determined that the city provided the residents adequate notice, then resolutions 1997–6 and 2000–2 merely executed the original 1979 legislative ordinance, and these resolutions would be purely administrative in nature, not subject to referendum.

## II. UTAH MUNICIPAL BOND ACT

¶ 32 Low sought injunctive and declaratory relief in the verified complaint in which Low alleged that Monticello City violated the Utah Municipal Bond Act (the "Act"), Utah Code Ann. §§ 11–14–1 to –9 (1999), or in the alternative, that Monticello City violated the Notice of Debt Issuance Act, *id.* § 11–14a–1. The trial court granted Monticello City summary judgment on this claim, concluding that (1) the Governmental Immunity Act shields Monticello City from this claim, (2) this claim

---

**3.** In 1979, Utah Code section 20–11–24 permitted only thirty days in which a party in interest could petition for a referendum on legislation passed by the governing body of a city or town. The present statutory scheme addressing this issue permits a referendum petition to be filed within thirty-five days after the local law is enacted. Utah Code Ann. § 20A–7–601(3)(a) (Supp. 2001).

**4.** The current version of this statute is codified at Utah Code Ann. § 20A–7–601(3) (Supp.2001), but because we apply the law as it existed at the time of the relevant events, we apply the 1976 statute. *Taghipour v. Jerez,* 2002 UT 74, n. 1, 52 P.3d 1252.

is unripe, (3) Low lacks standing to pursue this claim, (4) the Act did not require Monticello City to publish a bond notice, and thus any alleged misstatement in the notice did not violate the Act, and (5) the Notice of Debt Issuance Act is inapplicable to this case. Low did not argue on appeal that the trial court erred in concluding that the Notice of Debt Issuance Act is inapplicable, and we will therefore not address it. *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶¶ 54–55, 48 P.3d 895. Thus, we turn to whether the trial court properly granted Monticello City summary judgment on Low's claim that Monticello City contravened the Act by making misstatements in the notice of bonds to be issued.

¶ 33 "To the extent constitutionally permissible, municipalities ... may issue bonds payable solely from ... revenues" derived from the operation of revenue-producing facilities such as electrical power systems. Utah Code Ann. § 11–14–17 (1999); *see also id.* § 11–14–1(1)(k); *Tribe v. Salt Lake City Corp.,* 540 P.2d 499, 505 (Utah 1975) (noting that revenue bonds "are to be paid, interest and amortization of the principal, by the revenues derived from the project"); *Utah Power & Light Co. v. Ogden City,* 95 Utah 161, 171, 79 P.2d 61, 66 (1938) (stating that holders of proposed revenue bonds can satisfy bonds only from earnings of proposed power plant). Before the municipality can issue revenue bonds under the Act to cover the power system acquisition costs, the municipality's governing body must pass a resolution providing for the issuance of the bonds, Utah Code Ann. § 11–14–14 (1999); *see also id.* § 11–14–17, but the Utah Code does not obligate the municipality to hold an election of the general public regarding the issuance of revenue bonds, *id.* § 11–14–13; *see also Mun. Bldg. Auth. v. Lowder,* 711 P.2d 273, 277 (Utah 1985). The resolution must "specify either the rate or rates of interest, if any, on the bonds or specify the method by which the interest rate or rates on the bonds may be determined while the bonds are outstanding." Utah Code Ann. § 11–14–14(1).

¶ 34 Low first argues summary judgment was inappropriate because the trial court erred in concluding that the Act did not require the city to publish the notice of bonds to be issued and that therefore Monticello City did not violate the Act in making any misstatements in an optional notice. It is unnecessary, however, to address this contention if it is determined that the notice of bonds to be issued published by the city did not contravene the Act. Although we may not directly address the trial court's conclusion with such a holding, we can affirm a trial court's order if the order " 'is sustainable on any legal ground or theory apparent on the record.' " *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie,* 2001 UT 61, ¶ 18, 29 P.3d 1225 (quotation omitted)).

¶ 35 In this case, after the city passed resolution 2000–3 authorizing the issuance of revenue bonds to cover the cost of acquisition of the system, the city published a notice of bonds to be issued. With respect to such notice of bonds to be issued, the Utah Code states:

In case of a resolution or other proceeding providing for the issuance of bonds, the governing body may, in lieu of publishing the entire resolution or other proceeding, publish notice of bonds to be issued, titled as such, containing:

(a) the name of the issuer;

(b) the purpose of the issue;

(c) the type of bonds and *the maximum principal amount which may be issued;*

(d) the maximum number of years over which the bonds may mature;

(e) the *maximum interest rate which the bonds may bear,* if any;

(f) the maximum discount from par, expressed as a percentage of principal amount, at which the bonds may be sold; and

(g) the times and place where a copy of the resolution or other proceeding may be examined, which shall be at an office of the issuer, identified in the notice, during regular business hours of the issuer as described in the notice and for a period of at least 30 days after the publication of the notice.

**1164**

Utah Code Ann. § 11–14–21(3) (1999) (emphasis added).

**¶ 36** Low asserts that Monticello City violated subsection 11–14–21(3) of the Act because "the City misrepresented to its residents [both] in ... the notice of intent to issue and in the information on file with the City the maximum interest rate and maximum principal amount of the bonds." Subsection 11–14–21(3) provides that the municipality can give notice of a resolution authorizing the issuance of bonds "in lieu of publishing the entire resolution" because the subsection merely serves to afford persons in interest notice that a resolution was enacted authorizing the issuance of bonds and notice of the material contents of such resolution so that persons in interest have the opportunity to challenge the bonds. *See id.* § 11–14–21(3). Accordingly, a municipality makes misrepresentations in a notice of bonds to be issued only if the material terms of the bonds to be issued as set forth in the notice do not comport with the resolution authorizing the bonds.

¶ 37 In this case, the notice of bonds to be issued provided that the aggregate principal amount of the revenue bonds authorized in resolution 2000–3 would not exceed three million dollars. The notice of bonds to be issued also provided that the interest rate on those bonds would not exceed 6.75 percent per annum. The notice of bonds to be issued simply notified the public of the contents of resolution 2000–3: The notice provided that the city would issue "not more than $3,000,000 aggregate principal amount of its Electric Revenue Bonds ... to bear interest at a rate or rates of not to exceed six and three-quarters percent (6.75%) per annum." Because the notice of bonds to be issued perfectly recapitulates resolution 2000–3, the notice does not contain any misstatements regarding the city's intent to issue bonds.

**¶ 38** However, this is not to say that a municipality does not have a duty to issue

the bonds in conformity with the resolution as enacted, and consequently, with the notice of bonds to be issued. Indeed, because a resolution defines the parameters delimiting the material terms of a bond issuance, a municipality acts within its authority in issuing revenue bonds only when those bonds accord with the resolution.

**¶ 39** Therefore, because Monticello City did not make any misstatements in the notice of bonds to be issued, it did not violate the Act, and the trial court did not err in granting Monticello City summary judgment on Low's Utah Municipal Bond Act claim. Accordingly, there is no need to decide whether the trial court correctly determined that the Act did not require the city to publish notice. In addition, because the city did not violate the Act, Low's contentions that the trial court erred in granting Monticello City summary judgment under the Governmental Immunity Act, the ripeness doctrine, and the standing doctrine are now moot and those issues need not be resolved on appeal.[5]

## CONCLUSION

¶ 40 In sum, while Low's referendum claim is not time-barred by Utah Code section 20A–7–607(4)(a), the trial court erred in concluding that a referendum vote regarding the propriety of repurchasing the system would violate the contracts clauses of the United States and Utah Constitutions. Further, we reverse the grant of summary judgment to Monticello City on the referendum issue and remand to the trial court for proceedings consistent with this opinion. Finally, the trial court correctly granted summary judgment to Monticello City on the Utah Municipal Bond Act claim because Monticello City did not violate the Act, and we therefore affirm the summary judgment order on that issue.

5. Low further asserts in the briefs that Monticello City made arrangements with Zion's Bank as an alternate method of financing the purchase of the system without providing proper notice and without a public vote in violation of Utah Code section 10–7–16. However, because the transaction with Zion's Bank was never consummated, the issue is either unripe or moot, and we will therefore not address it. *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 16, 48 P.3d 968 (holding that this court will not issue opinions on issues that are moot); *State v. Ortiz*, 1999 UT 84, ¶ 3, 987 P.2d 39 (holding that this court will not issue opinions on issues that are unripe).

¶ 41 Associate Chief Justice DURRANT, Justice HOWE, Justice WILKINS, and Judge HANSON concur in Justice RUSSON's opinion.

¶ 42 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge TIMOTHY R. HANSON sat.